### In re Arlen B. MEKLER.

Supreme Court of Delaware.

Submitted Feb. 15, 1979.
Decided May 25, 1979.

Louis J. Finger, Wilmington, for the Censor Committee.

Alfred J. Lindh, Wilmington, for the respondent, Arlen B. Mekler.

Before HERRMANN, C. J., DUFFY and HORSEY, JJ.

PER CURIAM:

The Censor Committee of this Court reported the respondent, Arlen B. Mekler, a member of the Delaware Bar, for disciplinary action upon the basis of the following findings of fact and conclusions of law:

## I.

### Findings of Fact

"1.  On October 24, 1974, Jay Samuels (sometimes referred to as Jay Samuel, Jay Sukno Samuels, or Jay Samuel Sukno, hereinafter referred to as 'Samuels') consulted with Respondent with regard to a demand made by Wilmington Piano Company ('Wilmington Piano') for the immediate payment of the balance due or for the immediate return of a piano delivered by Wilmington Piano to Samuels.

"2.  The contract for the sale of the piano was in the name of Eleanor Duffy, but the real purchaser was Samuels.  The contract contained an assignment to Westinghouse Credit Corporation, which had agreed on the credit of Eleanor Duffy to finance $2,000.00 of the $3,600.00 purchase price, the $2,000.00 to be paid in monthly installments.  It was expected that Samuels would make the monthly payments.  The contract was signed by Samuels as buyer and by Eleanor Duffy as co-buyer.  Samuels paid the $1,600.00 down payment on the piano.

"3.  The list price of the piano was $4,400.00.  At the time of the purchase Samuels expressed surprise that he was getting such a good discount and was advised by the salesman that Wilmington Piano had had the piano in their possession for some time and that the piano had been used for purposes of showcasing.  Samuels was told that the piano had been in the home of an executive of Wilmington Piano for a number of months but Samuels did not inquire as to the extent to which the piano had been played.  Although he had obtained no express representation in that regard, and had made no inquiry, Samuels testified that he had the impression that the piano had not been played.

"4.  After the piano was delivered Westinghouse Credit Corporation refused to accept the assignment of the contract because Samuels had signed as buyer.  When a new contract was presented to Samuels with the request to have Eleanor Duffy sign as buyer, Samuels refused and consulted Respondent with respect to possible repossession of the piano.

"5.  Sometime after he received the piano Samuels complained to a salesman at Wilmington Piano about strings breaking in the piano.  Although Samuels is a professional musician who plays the piano with such force that strings will from time to time break, Samuels testified that he considered that the breakage of strings was more than he normally would have had during that period with a new piano.  The

salesman, in addition to mentioning the force with which Samuels was able to bring to bear on the strings mentioned that the daughter of the executive in whose home the piano was showcased had been taking lessons on it.

"6. From late October or early November, 1974, Respondent, on behalf of Samuels, conducted negotiations with Sidney Cohen ('Cohen'), President of Wilmington Piano, with a view to enabling Samuels to keep the piano. Wilmington Piano was unwilling, as a matter of general policy, to handle financing of the piano but was willing to give Samuels time to procure satisfactory financing even though it knew Samuels was performing on the piano at the Tally-Ho restaurant. At Respondent's request Cohen refrained from action to regain the piano, during which period he was advised that Samuels had received a loan from a bank. Samuels however cancelled the loan and Cohen set a deadline of November 29, 1974, for payment of the balance due on the piano.

"7. Respondent's objective in negotiating with Cohen was to persuade Cohen that Wilmington Piano should carry Samuels paper and complete the contract as made. To this end Respondent took the position that the contract was binding since there was no provision in the contract which made it conditional upon Westinghouse accepting the financing. His fallback or alternative objective was to delay repossession until another piano was available and to assure repayment of the downpayment of $1,600.00 in the event of repossession.

"8. When the deadline had been fixed for repossession of the piano Respondent insisted that the $1,600.00 downpayment should be returned. Cohen mentioned the damages to the piano and the fact that he would be receiving back a depreciated piano. Respondent considered that he had an undertaking from Cohen to repay the $1,600.00 upon repossession of the piano but Cohen states that he entered into no such undertaking.

"9. Fearing that Respondent might in some way attempt to interfere with repos-session of the piano, Cohen arranged for it to be picked up at the Tally-Ho early on the morning of the deadline, earlier than Respondent expected that it would be picked up. When Respondent found that the piano had already been picked up he demanded the $1,600.00 but Cohen refused to discuss it. After talking to Samuels, Respondent called Cohen and told him that if Wilmington Piano did not return the money there would be criminal action taken.

"10. When the piano was picked up, the top, a major part of the piano, was missing. The top was then being stored in the attic of the house Samuels was renting, Samuels having replaced it with a plastic top to be used as protection for the piano while in the nightclub. At the time the piano was taken there was broken glass in the action of the piano, alcoholic drink spills and the cabinet was scratched and dented.

"11. After the Piano was picked up, Respondent advised Samuels that he could start criminal proceedings in a Justice of the Peace Court. Respondent met Samuels at a Justice of the Peace Court that same evening. Respondent presented the facts to the Justice of the Peace, made recommendations as to the sections of the criminal code to be used and as to the language of the charges, and at the request of the Justice of the Peace drafted the specifications which were then included in the Complaint. Two Complaints, so drafted, were typed out and sworn to by Samuels and warrants were issued thereon.

"12. One of the criminal complaints charged that Cohen did 'feloniously convert $1,600 belonging to Jay Samuel by intentionally appropriating it to his own use intending to deprive Jay Samuel of the $1,600 by express representation that he would in the future engage in conduct in which he did not intend to engage . . . in violation of Section 844 (Section 841), Title 11 of the Delaware Code.' The 'express representation' referred to was Cohen's alleged promise to return the $1,600. Respondent had no reasonable basis to believe, and did not in fact believe, that this promise, if made and if false, constituted a violation of

Section 844 of the Criminal Code. A false promise under Section 844 constitutes a crime only if the promisor 'obtains property of another by means of' the false promise. Respondent was well aware that the $1,600 had not been obtained by means of the promise, but had been paid by Samuels to Wilmington Piano months before the promise was made. Accordingly, in the specifications Respondent used the word 'convert' instead of 'obtain' and otherwise twisted and distorted the Code language. Even under the distorted language, there was no basis for charging a conversion. Further, Respondent was well aware that the taking of the piano and the withholding of the $1,600 were pursuant to a bona fide claim of right.

"13. The specifications drawn by Respondent for the other Complaint charged that Cohen 'did feloniously obtain the $1,600 belonging to Jay Samuel with the intent to deprive him of it by intentionally creating a false impression that a piano he was purchasing was new, when in fact it was used . . . in violation of Section 843 (Section 841) of the Delaware Code.' Although Samuels had become aware of the previous use of the piano more than a month prior to the drafting of the Complaint, Respondent negotiated on Samuels behalf to enable Samuels to keep the piano and get the benefit of his bargain although no claim was made by either Samuels or Respondent that the piano had been sold pursuant to a false pretense. Even after the warrant had been sworn out, but before the arrest, Respondent wrote to counsel for Wilmington Piano urging Wilmington Piano to reinstate the contract and give Samuels the benefit of his bargain. Further, Samuels' dealings with Wilmington Piano had been with a salesman, and he had no direct contact with Cohen. Respondent had no basis for believing and did not in fact believe that the payment of the $1,600.00 was induced by any false impression created by Cohen.

"14. The purpose of Respondent's counsel and participation in the presentation of the criminal charges was primarily to obtain repayment of the $1,600.00, and was not for the purpose of bringing Cohen to justice.

"15. Between the time the Complaint was sworn out on November 29, 1974, and the day of Cohen's arrest on December 18, 1974, Respondent inquired at the office of the Justice of the Peace to find out whether the warrants had been served.

"16. Following Cohen's arrest on December 18, 1974, Respondent suggested to Cohen's counsel and Samuels suggested to Cohen that the criminal charge could be disposed of if Cohen would pay the $1,600.00.

"17. At the preliminary hearing held on January 2, 1975, Respondent appeared as attorney for Samuels and also testified in support of the warrants.

"18. At the conclusion of the preliminary hearing both charges were dismissed.

*Conclusions of Law*

"19. Respondent counseled and assisted Samuels in conduct he knew to be illegal, to wit, malicious prosecution, contrary to D.R. 7–102(A)(7) of the Delaware Lawyer's Code of Professional Responsibility.

"20. Respondent presented and participated in presenting criminal charges solely to obtain an advantage in a civil matter, in violation of D.R. 7–105 of the Delaware Lawyers' Code of Professional Responsibility."

II.

The respondent's Exceptions to the Final Report are based upon the contentions that various of the Committee's findings of fact are unsupported by evidence and that there are various inaccuracies in the Report; but the main thrust of the Exceptions, as emphasized upon the oral argument, is directed to the Committee's Findings of Fact Paragraphs 12 and 13 and the Committee's Conclusions of Law Paragraphs 19 and 20, as follows:

"12. This finding is essentially incorrect. Although presented as a Finding of Fact, it contains erroneous conclusions of law. The statement that Mekler 'twisted and distort-

ed the Code language' intemperately characterizes Mekler's conduct. It erroneously implies that § 841 of the Criminal Code does not contain the term 'convert' and implies that Mekler maliciously inserted that term into the criminal complaint when it was not in the statute. The second paragraph of § 841 provides in part that a person is guilty of theft if he 'exercises control over . . . property of another which is the subject of theft, and fraudulently converts same to his own use.' The weight of the evidence shows that Cohen promised to refund the $1,600 downpayment in exchange for the return of the piano. Mekler unequivocally testified that such a promise had been made. After Cohen had taken the piano back, Mekler believed that, pursuant to the agreement, the $1,600 belonged to Samuels. Mekler concluded that Cohen converted the money to his own use when he then failed to refund it. Mekler concluded Cohen's actions were fraudulent. Regardless of whether Mekler's conclusions were correct and regardless of whether a contractual debt is the subject of theft, there is no justification for stating that Mekler 'twisted and distorted the Code language.' It is immaterial whether Cohen retook the piano and withheld the $1,600 under a bona fide claim of right. Even where a good faith claim of right is relied upon as a defense to theft under § 841 of the Criminal Code, such a defense is an affirmative defense and has no bearing on the existence of probable cause.

"13. This finding is correct in part, but is argumentative and misleading. Samuels testified convincingly and without contradiction that when he first learned the piano was not new and had been extensively used, contrary to the express representations he had received, he was shocked and felt he had been deceived (T 142–143). He testified that he kept the instrument because he required it in his work as an entertainer at the Tally-Ho Restaurant where he was using it to perform six nights a week (T 146). The finding fails to note that Cohen signed the contract as president of Wilmington Piano Company and that the contract expressly represented the piano as new. It contained an 'N' in the appropriate block at the upper left describing the piano as new. Cohen admitted in his testimony before the Censor Committee that he knew the piano had been used for almost a year in the home of a vice president of Wilmington Piano for lessons and practice (T 23). Samuels testified before the Censor Committee that he would not have purchased the piano for the agreed price if he had known the truth about its prior usage, and had so informed Mekler (T 141–142).

\* \* \* \* \* \*

"19. This conclusion is incorrect. Mekler believes that he did not commit even the tort of malicious prosecution. However, assuming that he did, there is no basis in the evidence to conclude that Mekler knew his conduct was illegal. The aggressive, open and insistent manner in which Mekler acted throughout the entire sequence of events belies guilty knowledge on his part.

"20. This conclusion is incorrect. Even if, contrary to Mekler's testimony, the Censor Committee believes that obtaining an advantage in a civil matter was Mekler's primary objective, neither the evidence nor the Findings of Fact warrant the conclusion that this was his sole objective. That Mekler earnestly believed he was pursuing a valid claim of his client by statutorily authorized procedure is abundantly demonstrated throughout the transcript of the trial and the proceedings before the Censor Committee."

### III.

Upon due consideration of the record in the case, the Final Report, the Exceptions, and oral argument of counsel, it is the conclusion of this Court that the respondent has been guilty of unprofessional conduct in that he has violated Disciplinary Rules 7–102(A)(7) and 7–105 of the Delaware Lawyer's Code of Professional Responsibility.

Accordingly, it is adjudged and ordered:

(1) That the Final Report of the Censor Committee be and it is hereby confirmed;

(2) That the publication of this opinion shall constitute a public censure of the respondent;

(3) That the respondent shall forfeit and pay a fine of $1,000. to be paid over, not later than, June 30, 1979, to the Clients' Security Trust Fund of the Bar of the State of Delaware.

■ In determining the appropriate disciplinary action to be taken in this case, the Court has taken into consideration the fact that the respondent has already sustained a substantial penalty in the judgment rendered against him in civil litigation which arose out of the same facts and course of misconduct.