In the Matter of a Member of the Bar of the Supreme Court of the State of Delaware Arlen MEKLER, Respondent.

No. 305, 1994.

Supreme Court of Delaware.

Submitted: Aug. 15, 1995.
Decided: Nov. 27, 1995.

Victor F. Battaglia (argued), and David L. Finger, Biggs and Battaglia, Wilmington, for Respondent.

David Curtis Glebe, Chief Disciplinary Counsel, Wilmington, for Office of Disciplinary Counsel.

Before VEASEY, C.J., WALSH and HOLLAND, JJ.

PER CURIAM:

This matter is before the Court for final disciplinary action upon review of the March 16, 1995 report ("the Report") of the Board on Professional Responsibility (the "Board"). The respondent, Arlen Mekler ("Mekler" or "Respondent") is a member of the Bar of this Court, having been admitted to practice in 1972. The Board found that Mekler violated certain of the Delaware Lawyers' Rules of Professional Conduct (the "DLRPC") and recommended as a sanction a public reprimand plus two years of probation with conditions.

Mekler contends that the Board failed to interpret properly the scope of the Rules of the DLRPC deemed to have been violated, and erred in making findings of fact and applying those findings in interpreting the DLRPC. Mekler also contends that, in any event, the sanction is too harsh.

The Office of Disciplinary Counsel (the "ODC") contends that the Board was correct in finding that certain Rules of the DLRPC were violated, but that the Board erroneously failed to find other violations. Mekler argues that, since the ODC did not cross-appeal, this Court may not review the decision of the Board not to find those violations. The ODC further contends that "a severe public sanction such as suspension or disbarment" is warranted.

The violations of the DLRPC found by the Board are supported by the evidence and should be sustained on review. Those findings, therefore, are **AFFIRMED.** As to Mekler's contention that this Court may not consider the ODC's argument that the Board erroneously refused to find certain other violations, we hold that, in a proper case, this Court is not precluded from considering and reversing the Board's refusal to find certain violations, even in the absence of a "cross-appeal." We do not, however, find any error in the Board's refusal to find certain violations of the DLRPC which are urged in this Court by the ODC. Accordingly, those findings are **AFFIRMED.**

As to the sanction to be imposed by this Court for the violations found by the Board and sustained herein, this Court may exercise its own judgment and is not bound by or limited to the Board's recommendation. Based on this record, the Court has concluded that a significant suspension is warranted and the sanction recommended by the Board is inadequate and inappropriate. Accordingly, **IT IS THE JUDGMENT OF THIS COURT** that Respondent shall be **SUSPENDED** from the practice of law for a period of not less than one year, commencing on January 1, 1996. Reinstatement will be considered upon any application filed by Mekler after December 31, 1996, provided he has complied with the conditions for reinstatement imposed herein.

## I. THE FACTS

On October 19, 1992, the ODC filed two Petitions for Discipline against Mekler. One petition alleged violations arising out of Mekler's representation of Robert and Kelly Patterson (the "Pattersons"). The other alleged violations of the DLRPC arising out of Mekler's representation of Gordon C. Garvine, III ("Garvine").

On March 19, 1994, the ODC filed two additional Petitions for Discipline against Mekler. These petitions arose out of Mekler's various scheduling and attendance problems in connection with Family Court and Superior Court proceedings. The ODC consolidated these four Petitions for Discipline, and Mekler agreed to enter into a conditional admission which the Board later approved.

The matters involved in all four petitions have been presented to this Court for review.[1] The facts relevant to each of the charges before the Board are summarized below.

### A. Board Case No. 53, 1992—The Pattersons' Complaint

The facts relating to the Patterson matter are complex and the discussion of those facts in the Report is extensive. The findings of the Board are supported by the record. They show that Mekler permitted the Patterson matter to be handled (and mishandled) to a great extent by his law clerk (not a member of the Delaware Bar) and his paralegal. The issues involved, among other actions and inactions of Respondent, the following: findings of falsifying Mekler's signature on pleadings and affidavits, apparently without Mekler's knowledge; disrespect for clients and judges in scheduling; disruption of tribunals; lack of diligence; failure to supervise employees; delays; confusion; and a woeful lack of communication. Some of the excerpts from the Board's findings are as follows:

> ... The Pattersons came to Respondent in February of 1992 because they needed immediate help with regard to a Support Order.... They did not meet with Respondent, but with his law clerk, Mark Rassman, Esquire, a member of the Pennsylvania Bar but not the Delaware Bar.... They were informed that the fee for retaining Mr. Mekler would be $850.... Based upon the Pattersons' contentions, Respondent formulated the basis for a Motion for Review *de Novo*. The language of the Motion was prepared according to Respondent's formulation and direction and using forms normally used by his office and was placed in his box for signature as attorney for the Pattersons.
>
> On Friday, February 14, 1992, Respondent was home ill. He received a telephone call from Mr. Rassman who mistakenly reported that it was the last day on which the Motion for Review *de Novo* could be filed. Respondent directed Mr.

Rassman to have Mr. Patterson file the Motion. Mr. Rassman tried to reach the Pattersons without success.... [H]e signed Mr. Patterson's name to the Petition and had an employee of the office, Ms. Lepore, notarize the signature. Thus, in Respondent's absence, and without his knowledge or approval at that time, Mr. Patterson's name was signed to the Petition by Mr. Rassman and Ms. Lepore signed Respondent's name as notary. The form was filed with the Family Court on what Mr. Rassman computed as being the final day for filing which was the tenth day although subsequently it was learned that the correct deadline was actually fifteen days.

\* \* \* \* \* \*

Respondent concluded that the contention that the Pattersons did not receive notice or received improper notice was totally inaccurate and not arguable.... Respondent made calculations on the arrearages on the Pattersons' Support Order and measured the Order against Mr. Patterson's income situation. Respondent concluded that not only was the amount of the Support Order fair to Mr. Patterson but it was probably less than could have been ordered. Respondent also confirmed the correctness of the arrearages.

\* \* \* \* \* \*

The Pattersons contend that after the initial activity on their case in February of 1992, there was no direct communication between Respondent and the Pattersons until the end of June of 1992 despite Kelly Patterson's persistent telephone calls to Respondent's office requesting information as to the status of the Pattersons' case. When Kelly Patterson had not received notice of a hearing date, she called the Family Court directly and learned that the hearing had been scheduled for June of 1992, of which she advised Respondent's office. Since this hearing was coming up, the Pattersons came to Respondent's office for the second time in early June in order to discuss the scheduled hearing. At that

---

1. This Court rejected Mekler's conditional admission based on a finding that such a resolution was inappropriate, and remanded the case to the Board for disposition. *In re Mekler*, Del.Supr., No. 305, 1994, Walsh, J. (Sept. 16, 1994) (ORDER).

meeting, the Patterson again met only with Mr. Rassman, who was called out of the room shortly after the meeting began, leaving the Pattersons to sit alone for approximately an hour.

\* \* \* \* \* \*

A third meeting with Respondent and the Pattersons was scheduled for later in the month of June. Prior to this third visit, Respondent called the Pattersons to cancel the meeting and the meeting was rescheduled for July 1, 1992. This was the first time that the Pattersons had ever met personally with Respondent. Respondent related to them at that time that the record showed they had no claim on lack of notice for the February 5, 1992, hearing; that the Support Order and arrearages had been computed correctly; and that their best interest would not be served by pursuing the Review *de Novo* through a Family Court hearing. The Pattersons became upset that they had paid their legal fees up front and had received legal advice which they were now being told was incorrect. They questioned Respondent as to why they should have hired him in the first place. In their view, the legal advice they were now getting should have been given to them at the time of their initial visit. However, they agreed with Respondent that it was probably not in their best interest to go to the Family Court with a Review *de Novo*. The Pattersons therefore requested that the Respondent wrap up his representation of them after making arrangements to modify some of the language in the Support Order, which Respondent told them could be done quickly and without having to go through the Family Court.

Several weeks went by and the Pattersons heard nothing from Respondent. After several calls to the Respondent's office later in July, Kelly Patterson was finally told that the Respondent had not completed his work on the case. The Pattersons then heard nothing from the Respondent for the rest of July and the entire month of August.

In mid-September, Bob Patterson received a call from Respondent's secretary informing him that his court hearing on the Review *de Novo* was set for December which was directly contrary to the Pattersons' expressed wishes and the advice of Respondent.... The parties had agreed that the Petition for Review *de Novo* would be withdrawn but Respondent wanted to make sure there was no misunderstanding so he prepared an Affidavit to be signed by Mr. Patterson, withdrawing the Petition although it could have been withdrawn simply by signature of the attorney. Mr. Patterson had an appointment to see Respondent on October 5, 1992, at 2:30 p.m. for the purpose of signing the Affidavit to withdraw the Petition. The facts of what happened thereafter are in dispute.

\* \* \* \* \* \*

The Petition for Discipline charges Respondent with committing perjury by falsely testifying that he witnessed Bob Patterson sign the Affidavit withdrawing the Petition for a Review *de Novo* and that he executed the notary certifying to Mr. Patterson's signature. This testimony was given when ODC conducted the initial investigation of the case and was testimony given under oath by Respondent. The Panel is convinced that the evidence shows that the Affidavit attached to this Petition was never executed by Respondent but that his signatures on the Petition were affixed by his employee, Ms. Lepore. In his testimony at the hearing, Respondent candidly registered his doubt about witnessing Mr. Patterson sign the Affidavit in light of the fact that he has now noticed the date written on the Affidavit as not being affixed in his handwriting. ODC readily admits that in the initial discovery deposition taken, Respondent indicated that he did not have a clear memory of the incident. However, the Panel does not view this as a criminal act of perjury which obviously requires an intentionally made statement which is knowingly false. It also does not arise to conduct which would be considered dishonest, fraudulent, deceitful, or an intentional misrepresentation. Filing of the Petition to Withdraw did not amount to engaging in conduct prejudicial to the administration of justice (DLRPC

8.4(d)) because it achieved the desire of the client to dismiss the Petition for Review *de Novo* and reflected exactly what the client desired. The Board therefore finds no violation of DLRPC 8.4(b) dealing with criminal conduct or DLRPC 8.4(c) dealing with dishonest conduct on the part of Respondent.

The Board does recommend that Respondent has violated DLRPC 5.3 requiring a lawyer who has direct supervisory authority over a non-lawyer to "make reasonable efforts to insure that the person's conduct is compatible with the professional obligations of the lawyer. . . ." DLRPC 5.3(b). Ms. Lepore, a paralegal working for Respondent, testified that the Petition requesting a Review *de Novo* which purportedly had been signed by Robert Patterson was in fact signed by Mark Rassman who affixed Mr. Patterson's name thereto and that she executed the notary, signing Respondent's name thereto. Ms. Lepore contended that she was given authority directly by Respondent to sign his name. Regarding the Petition to Withdraw, she saw Robert Patterson sign it when Respondent was not present and then she signed Respondent's name to the Petition and also the Affidavit. It was her contention that she was asked to prepare and file the Motion to Withdraw and also execute it on behalf of Respondent. . . . The Panel cannot overlook the fact that Ms. Lepore signed Respondent's name to two Affidavits, both of which were filed with the Family Court, coupled with her sworn testimony that she had authority to sign for Respondent.

## B. Board Case No. 6, 1993—The Garvines' Complaint

In 1990, Gordon and Geraldine Garvine and their son Gordy (the "Garvines") retained Mekler to represent Gordy in relation to Family Court proceedings involving a fight in which Gordy was involved. Prior to a scheduled March 26, 1991 case review in Family Court, Mekler applied for a continuance due to scheduling problems. Under the mistaken belief that the continuance had been granted, Mekler informed the Garvines not to attend. As a result, neither Mekler

nor the Garvines attended the March 26 case review. Judge Wakefield then issued a judicial disposition stating that Mekler had caused the scheduling problem.

The parties rescheduled the case review for 3:00 p.m. on May 3, 1991. Although Judge Wakefield and the Garvines were present at the proper time, Mekler, who was attending a call of the calendar in Superior Court, was absent, apparently without giving prior notice to Judge Wakefield or the Garvines. Mekler eventually appeared, but he did so only after Judge Wakefield had dismissed the Garvines. Judge Wakefield directed Mekler to file a written explanation of his failure to appear and indicated that the Family Court might impose sanctions directly.

The case went to trial in June 1991, and Gordy was eventually found guilty. The court ordered the Garvines to pay restitution in an amount to be agreed upon by the parties. The Garvines waited for Mekler to communicate to them the amount that they had to pay and the details of payment. Mekler met with opposing counsel and agreed to set restitution at $934. Mekler claims that he mailed this notice to the Garvines on or about September 24, 1991. The Garvines claim that they never received this notice. They made repeated phone calls to Mekler's office over a period of many months but did not hear from him.

The police took Gordy into custody in October 1992 for failure to pay the restitution. The Garvines filed a disciplinary complaint against Mekler as well as a malpractice suit. Gordy admitted during the malpractice suit that the Garvines knew the amount of the restitution to be paid, did not pay it, and thought that they had "got[ten] away with it."

Here, again, the facts are difficult to articulate succinctly, largely because they turn on Mekler's sloppy practices. Excerpts from the conclusions of the Board are illustrative:

*BOARD CASE NO. 6, 1993*

\* \* \* \* \* \*

B. *Conclusions of Law and Recommendation*

Respondent is charged with seven violations of DLRPC. Very succinctly, the charges are: DLRPC 1.1, lack of competence; 1.3, lack of diligence; 1.4(a), lack of communication; 1.4(b), lack of explanation; 3.4, knowingly disobeying an obligation owed to a tribunal; 3.5(c), engaging in conduct intended to disrupt the tribunal; and 8.4(d), engaging in conduct that is prejudicial to the administration of justice.

The Panel does not believe that Respondent's conduct in this case arises to the standard of "knowingly" or "intentionally" doing or failing to do any act owed to his client or the Court.... Respondent failed to return many telephone calls placed to him by his clients; he failed to keep his clients updated regarding their case; and he failed to allocate his time appropriately so that he could appear in Court as required without delaying the Court, the opposing attorney, and his clients.

\* \* \* \* \* \*

... After the trial, where Gordon Garvine was found guilty, there is no indication in the record that Respondent discussed the restitution issue with the Garvines and further, there is nothing in the record to indicate that he gave the Garvines notice of the Consent Order on restitution other than Respondent's notations on the Order that his office would have routinely mailed a copy of the Order to the Garvines. Although the Garvines deny receipt of the Order or any notice of the amount of restitution and the date when it was due, supposedly Gordon Garvine testified at the arbitration hearing that he had knowledge of these facts. The record is devoid of any indication that Respondent picked up the phone and called the Garvines about the Order, telling them the amount and when it was due or that he wrote a letter to them explaining this to the Garvines. The end result was Gordon Garvine being picked up under a capias, causing his parents to scurry around to find money from friends in order to get him out of jail.

The Panel recommends that Respondent failed to keep the Garvines reasonably in-formed about the status of their case in violation of DLRPC 1.4. Respondent also failed to act in the case with the thoroughness required by DLRPC 1.1 which requires an attorney to provide competent representation to his client. He also violated DLRPC 1.3 requiring him to act with reasonable diligence and promptness in representing his client. His failure to appear at both of the case review hearings before Judge Wakefield was simply inexcusable under the circumstances.

The other charges against Respondent require an intentional or known [sic] violation and Respondent's conduct simply does not rise to that level.... In conclusion, the Panel feels that had Respondent taken more time to discuss the case with his clients and keep them apprised of the handling of their case and had he studied his schedule to avoid Court conflicts, then this matter would never have arisen to the level of a Disciplinary Complaint.

## C. Board Cases Nos. 55 & 61, 1993— The Family Court Judges' Complaints

In August 1993, Family Court Judges Wakefield, Ableman and Crompton filed disciplinary complaints with the ODC against Mekler in connection with his disruption of the scheduling of various cases in their courts. These complaints were later consolidated as Board Case No. 61, 1993. Judge Wakefield had earlier filed another disciplinary complaint against Mekler on other grounds, and this was docketed as Board Case No. 55, 1993.

The complaints at issue in Board Case No. 61, 1993 arose out of Mekler's involvement in a criminal case before Judge Toliver in the Superior Court. Prior to the start of the case, Mekler asked Judge Toliver to delay its start one day so that he could attend, presumably as a spectator, the United States Senate confirmation hearing for Judge Ruth Bader Ginsburg, who later was confirmed and became Justice Ginsburg. Although Mekler had several cases in the Family Court the following week, he did not foresee

any problem with the criminal case conflicting with these other cases.[2]

One day after the case began, opposing counsel applied for another continuance due to a family vacation. Mekler objected strongly, informing Judge Toliver that he was scheduled to appear before Judge Ableman the next week and that if Judge Toliver granted the continuance he would have a major scheduling problem. He did not tell Judge Toliver that he had more than one case scheduled for that week. Judge Toliver met with Judge Ableman and informed her of the delay. Judge Toliver testified before the Board that, had he known of both Mekler's busy court schedule the following week and opposing counsel's vacation plans, he would not have granted Mekler's motion for a delay. Nonetheless, he stated that he did not believe that Mekler tried to mislead him.

With regard to the other pending Family Court cases, Mekler submitted written requests for continuances. In none of these requests to the Family Court did he mention his request to Judge Toliver for a delay in the criminal case in Superior Court. The judges eventually met and discussed the scheduling problems. They came to the conclusion that Mekler had caused the scheduling problems and filed concurrent disciplinary complaints against him. Judge Wakefield also filed another disciplinary complaint against Mekler, arising out of his failure to appear for a scheduled case.

The following are excerpts from the Report:

### BOARD CASE NO. 55, 1993

\* \* \* \* \* \*

B. *Conclusions of Law and Recommendation*

The Petition charges Respondent with four acts of misconduct: DLRPC 1.3, lack of reasonable diligence and promptness; 3.2, failure to make reasonable efforts to expedite litigation; 3.5(c), engaging in conduct intended to disrupt a tribunal or in an undignified or discourteous manner degrading to a tribunal; and 8.4(d), engaging

in conduct that is prejudicial to the administration of justice.

Respondent argues that DLRPC 1.3 has no application according to the facts of this case because that rule relates only to the lawyer's duty to the client and not to the Court. The Panel disagrees. DLRPC 1.3 states, "A lawyer shall act with reasonable diligence and promptness in representing a client." ... In the present case, Respondent failed to comply with the directives of the Family Court to appear with his client at a hearing requested by him or, in the alternative, to file promptly a motion dismissing his client's case when he knew that she no longer desired to pursue the same.... [H]ad Respondent handled this matter appropriately, he would have filed a motion dismissing this case just as soon as his client advised him that she no longer desired to purse the Review *de Novo*. This would have taken the case off the Court calendar and would not have necessitated Judge Wakefield and Mr. Denney in holding a hearing that was completely unnecessary. It would also have cleared the Court calendar for other cases to be heard at the time when this hearing in this case was needlessly scheduled. Respondent obviously violated the provisions of this disciplinary rule.... [T]he Panel finds it to be most unusual and certainly not a proper office practice to have all of Respondent's Court commitments entered only on his [own] calendar without a system of checks and balances to assure the accuracy of that calendar.

### BOARD CASE NO. 61, 1993

\* \* \* \* \* \*

B. *Conclusions of Law and Recommendation*

\* \* \* \* \* \*

The Panel finds, once again, that Respondent has failed to communicate properly with all parties involved and has agreed to a scheduling of five court cases, which schedule could only be accomplished successfully if everything occurred perfect-

---

**2.** Indeed, opposing counsel in the criminal case agreed to the one-day delay even though he had a Family Court case scheduled to begin at the same time as Mekler's.

ly and without interruption. The three Family Court judges were justifiably upset about their schedules being disrupted because of the Superior Court trial which had been postponed one day to allow Respondent to attend Justice Ginsberg's hearing. They were all justifiably concerned that all of the facts had not been brought to their attention nor to the attention of Judge Toliver.

\* \* \* \* \* \*

Respondent initially had a duty to see that his cases were scheduled so that there was a reasonable anticipation that they could all be tried without delaying the Courts, opposing counsel, his clients, and witnesses. If any anticipated delays arose, Respondent clearly had a duty to notify everyone involved, especially the judges responsible for handling and scheduling the cases. The failure of Respondent to handle these matters appropriately as stated herein amounts to a violation of disciplinary rule DLRPC 1.3 requiring a lawyer to act with reasonable diligence and promptness in representing his client. These facts also show that Respondent violated DLRPC 3.2 which requires a lawyer to make reasonable efforts to expedite litigation consistent with the interest of the client.

The Respondent also violated DLRPC 3.5(c) which states that a lawyer shall not engage in conduct intended to disrupt a tribunal or engage in undignified or discourteous conduct which is degrading to a tribunal.

### D. Summary of the Board's Findings and Recommendations

The Board found that Mekler had violated DLRPC 1.3 and 5.3 in Board Case No. 53, 1992; DLRPC 1.1, 1.3 and 1.4(a) in Board Case No. 6, 1993; DLRPC 1.3, 3.2 and 3.5(c) in Board Case No. 61, 1993; and DLRPC 1.3 and 3.2 in Board Case No. 55, 1993. After both Mekler and the ODC submitted briefs dealing with sanctions, the Board recommended a two-year probation with conditions, coupled with a public reprimand.

Pursuant to Board Rule 9(e), the Board filed the Report to which Mekler filed objections. Although the ODC did not file a document in the nature of a "cross-appeal," it has contested some of the Board's findings in Mekler's favor and urged this Court, in effect, to reverse the Board as to those findings while affirming the others.

## II. REVIEW OF BOARD FINDINGS BY THIS COURT

 This Court must determine whether the record contains substantial evidence to support the Board's findings. *In re Agostini,* Del.Supr., 632 A.2d 80, 81 (1993). The Court reviews the Board's conclusions of law *de novo. In re Figliola,* Del.Supr., 652 A.2d 1071, 1074 (1995); *In Re Barrett,* Del.Supr., 630 A.2d 652, 656 (1993).

The Board determined that Mekler violated DLRPC 1.3 and 5.3, which respectively require each lawyer to "act with reasonable diligence and promptness in representing a client," and to make reasonable efforts to ensure that the lawyer's staff conducts itself in a manner which is compatible with the lawyer's professional obligation. Both Mekler and the ODC challenge the Board's findings. Mekler claims that the Board should not have found him in violation of DLRPC 1.3 or 5.3. The ODC contends that the Board erred when it failed to find that Mekler also violated DLRPC 1.4(a) and (b), 1.5(a), 3.3(a)(4) and 8.4(d).

Mekler contends that the facts do not support a finding that he violated any disciplinary rules. He claims that his inaction was reasonable under these circumstances and that he had adequately supervised his employees.

### A. DLRPC 1.3 and 5.3

 DLRPC 1.3 requires that lawyers act in a diligent fashion when representing clients. The record reflects that the Pattersons discussed their situation with Rassman in February 1992 and that Rassman filed the Petition shortly thereafter. Mekler did not look at the Pattersons' file until July 1992, a period of about five months. When he finally did review the file in July, he told the Pattersons that the course of action Rassman had implemented was incorrect. The Board

found that the five-month period between the filing of the Petition and Mekler's review of the Patterson file was evidence of a lack of diligence.

Mekler claims that, because he did not miss a deadline before the Family Court, his delay in reviewing the Pattersons' file was "reasonable under the circumstances." Mekler's argument is unpersuasive. As the Board noted in its well-reasoned report, although the Pattersons failed to give Mekler's office accurate information at their initial consultation, "a prompt review of the Court records by Mekler would have revealed [the weakness of the Pattersons' claim] and there appears to be no excuse for not discovering these facts from the Court records prior to July of 1992, approximately five months after the initial consultation." Report at 12–13 (Mar. 16, 1995). Mekler's delay in reviewing the Pattersons' file caused this matter to drag on unnecessarily for five months. The Board's finding that Mekler violated DLRPC 1.3 is supported by substantial evidence.

■ DLRPC 5.3 requires that a lawyer supervise his or her staff to ensure that the staff's actions and work product conform to ethical and legal standards. In this case, LePore testified that Rassman, rather than Mekler, signed the Pattersons' Petition and that she falsely notarized it. LePore also testified that Mekler gave her direct authority to sign his name.

Mekler argues that: (1) due to personal problems between Mekler and LePore, Le-Pore might have purposefully misled the Board during testimony; and (2) he had specifically informed his staff prior to the Patterson incident not to sign his name to court documents. Although Mekler and LePore may have had personal problems, there is nothing to indicate that she did not testify truthfully before the Board. Further, Le-Pore testified that, despite Mekler's warning to his staff not to sign his name to court documents, he told her that she nonetheless had authority to do so. Although Mekler was required to make only a reasonable effort to ensure that his staff conformed to professional guidelines, it appears that his behavior did not conform to this requirement. Therefore, the Board did not err when it found that LePore's and Rassman's signing of Mekler's name to two documents filed with the Family Court showed that Mekler did not satisfy DLRPC 5.3 in supervising his staff.

## B. The Board's Refusal to Make Certain Findings of Violations of DLRPC

### 1. *Failure of ODC to "Cross–Appeal"*

■ This Court is not precluded from reviewing a finding of the Board in favor of a respondent in a disciplinary proceeding, even though the ODC has not "cross-appealed" the refusal of the Board to find a violation. It is the exclusive responsibility of this Court to supervise, regulate and discipline members of the Delaware Bar. *In re Appeal of Infotechnology, Inc.*, Del.Supr., 582 A.2d 215, 218 (1990). The Respondent in a disciplinary matter does not appeal. Here, Meckler filed objections to the Report of the ODC. Accordingly, the Court is not bound by the failure of ODC to assert error in the Board's finding.[3] Here, however, the issue is moot because we sustain the Board's findings in Mekler's favor and reject on the merits the ODC's arguments to the contrary.[4]

---

3. The Rules of the Board on Professional Responsibility provide that this Court review the Board's findings "pursuant to the rules governing civil appeals in the Supreme Court, with the respondent deemed the appellant." R.Bd.Prof. Resp. 9(e). The rules governing civil appeals ensure that "absent a cross-appeal, the appellee may not attack the judgment of the court below with a view to enlarging its own rights or lessening the rights of its adversary." *Mann v. Oppenheimer & Co.*, Del.Supr., 517 A.2d 1056, 1060 (1986). Although the scope of Rule 9(e) is not clear with respect to the necessity for the ODC cross-appeal in a disciplinary matter where this Court is reviewing a report of the Board, we construe the rule narrowly as a housekeeping rule relating to the sequencing of briefs and the like, rather than a rule which would limit this Court's supervisory role in reviewing *de novo* the entirety of the Board's action.

4. Under the new Rule 9(e), not applicable in this case, the ODC has the right to file objections to the Board's report in the same manner as a respondent. Nevertheless, even if the ODC fails to file objections, this Court has the power of plenary review.

### 2. *Board Findings of No Violation of DLRPC 1.4(a) and (b), 1.5, 3.3(a)(4) and 8.4(d)*

■ DLRPC 1.4(a) and (b) provide that a lawyer shall keep clients reasonably informed about the status of a matter and discuss the matter with the clients. Although Mekler did not review the Pattersons' file until five months had passed since their initial visit, the record reflects that Mekler's office did keep the Pattersons informed about their child support case. The Pattersons met with Mekler's law clerk, Rassman, on several occasions and discussed the matter with him. Additionally, Mekler did meet with the Pattersons well before any action was scheduled before the Family Court, discussed strategies and explained available options. While Mekler's actions in delegating improperly may be the subject of other contentions of disciplinary violations, there does not appear to be clear and convincing evidence of a violation sufficient to overturn the Board's findings related to these alleged violations of the DLRPC.

DLRPC 1.5 prohibits lawyers from charging a client an unreasonable fee. Here the Board's finding that the total time recorded on the Pattersons' final bill, as well as the total of fees charged, was not unreasonable is supported by the evidence. As the Board noted, this matter could have been handled more efficiently and more diligently, resulting in a lower bill, but Mekler did not charge the Pattersons exorbitant fees for the work done. Hence, the Board's determination that DLRPC 1.5 was not violated is supported by the record.

■ The ODC contests the Board's finding that Mekler did not violate DLRPC 3.3(a)(4), which prohibits a lawyer from offering evidence to a tribunal which the lawyer knows to be false. The record shows that Mekler did not know that his name had been signed without his authority on any of the Patterson documents submitted to Family Court until well after the case had been closed. Although Mekler should have informed the Family Court of the unauthorized signatures, and his failure to do so is unpro-

fessional,[5] it is not necessarily a violation of Rule 3.3(a)(4). We are unable to hold that the Board erred when it found that there was no clear and convincing evidence to support a holding that Mekler knowingly submitted false evidence to the Family Court.

■ DLRPC 8.4(d) provides that a lawyer shall not engage in conduct prejudicial to the administration of justice. Although the motion to withdraw was falsified by LePore, it achieved the Pattersons' objectives and removed the matter from the Family Court. Though the falsified affidavit was improper conduct by Mekler's staff, the Board's determination that the submission of the falsified document did not prejudice the administration of justice is supported by the record.

### 3. *Professionalism*

■ It is important to understand the distinction between conduct which violates disciplinary rules of the DLRPC and conduct which is "unprofessional." Professionalism includes, but is not limited to, compliance with the ethical rules embodied in the DLRPC. Professionalism goes beyond the minimum standards *"required* of all lawyers ... professionalism is a higher standard *expected* of all lawyers." The Honorable Harold G. Clarke, Chief Justice (Retired), Supreme Court of Georgia, *State Bar Journal of Georgia* (May 1989) (emphasis in original). The Preamble to the DLRPC provides, in part:

In all professional functions a lawyer should be competent, prompt and diligent. A lawyer should maintain communication with a client concerning the representation.

\* \* \* \* \* \*

A lawyer should strive to attain the highest level of skill, to improve the law and the legal profession and to exemplify the legal profession's ideals of public service.

\* \* \* \* \* \*

The Rules do not, however, exhaust the moral and ethical considerations that should inform a lawyer, for no worthwhile human activity can be completely defined

5. *See* Section II(C)(3), *infra*.

by legal rules. The Rules simply provide a framework for the ethical practice of law.

Professionalism embodies an attitude and a dedication to civility, skill, businesslike practices and a focus on service, rather than making money. Professionalism will often be rewarded materially.

> The defining tension in law practice today is between professionalism and money.... [We] do not have to choose between professionalism and money. Indeed, we do not even have that choice. What we do have to do is decide simply which one comes first. If our first priority is the highest level of service to clients of which we are capable, coupled with our obligations to the legal system and to our society, then everything else falls into place.... If, on the other hand, money is our first priority, if making as much money as we can is our goal and serving clients is seen simply as a means of making money, all kinds of results flow from that, and they are almost all bad.

Seth Rosner, Chair of the ABA Standing Committee on Professionalism, "Professionalism and Money: A Matter of Priorities," *The Professional Lawyer* 9–11 (May 1993); *see also* E. Norman Veasey, "Professionalism and Pragmatism—The Future," *Delaware Lawyer*, at 13 (Winter 1993).

## III. THE BOARD DID NOT ERR IN FINDING THAT MEKLER'S CONDUCT IN THE GARVINE CASE VIOLATED SEVERAL DLRPC

In the Garvine case, the Board found that Mekler violated DLRPC 1.4(a), 1.3 and 1.1, which respectively require a lawyer reasonably to inform clients about the status of a matter, act with reasonable diligence, and provide competent representation to clients. As with Board Case No. 55, 1992, both Mekler and the ODC challenge the Board's findings. Mekler claims that the Board should not have found him in violation of DLRPC 1.4(a), 1.3 or 1.1. The ODC contends that *the Board* erred when it found that Mekler did not violate DLRPC 1.4(b), 3.4(c), 3.5(c) and 8.4(d).

### A. DLRPC 1.4(a), 1.3 and 1.1

The Board sanctioned Mekler for violating DLRPC 1.4(a), 1.3 and 1.1, relying in part on Mekler's alleged failure to inform the Garvines of the Consent Order on restitution. Mekler claims that the record shows that he did inform the Garvines of the Consent Order. We find that there is ample evidence to support the Board's findings to the contrary.

■ It is undisputed that Mekler erroneously believed that he had secured a continuance for the Garvines and so informed them. As a result of this misbelief, neither the Garvines nor Mekler appeared before Judge Wakefield at the first scheduled case review. Nor did Mekler appear before Judge Wakefield at the second case review or communicate with either the court or the Garvines regarding his inability to appear. These facts clearly show violations of: Rule 1.4(a) (a failure to inform the Garvines of the status of their case); Rule 1.3 (a lack of diligence); and Rule 1.1 (a lack of preparation bearing on competence).

### B. DLRPC 1.4(b), 3.4(c), 3.5(c) and 8.4(d)

Notwithstanding the Board's findings concerning DLRPC 1.4(a), 1.3 and 1.1, the ODC argues that the Board should have found that Mekler violated 1.4(b), 3.4(c), 3.5(c) and 8.4(d).

■ DLRPC 1.4(b) requires a lawyer to explain properly a legal matter to his or her client. There is no evidence to support a finding that Mekler violated this rule. In fact, the evidence shows that Mekler met with the Garvines briefly, explained the matter to them, urged them to settle, and that the Garvines disregarded his advice. The Board did not err when it did not find a violation of Rule 1.4(b).

■ With regard to DLRPC 3.4(c), the Board found that Mekler did not knowingly disregard an obligation to the tribunal. There is no evidence demonstrating that the Board erred. Although Mekler obviously erred when he thought that the court had granted his motion for a continuance, it appears that this erroneous belief was based on unprofessional office procedures rather than

any knowing or willful attempt to disregard an obligation to a tribunal. Likewise, the Board's finding that Mekler did not violate 3.5(c) by intentionally engaging in conduct to disrupt a tribunal is supported by the same evidence.

 The ODC's only possible meritorious claim is that the Board erred when it found that Mekler did not violate DLRPC 8.4(d). That rule prohibits lawyers from engaging in conduct prejudicial to the administration of justice. Twice failing to appear before a tribunal at the appropriate time is clearly unprofessional. In a given case, it could be found to be a violation of DLRPC 8.4(d) since such conduct can be disruptive and a waste of the court's time and resources. Under the circumstances of this case, however, we do not find that the Board erred in concluding that the record does not establish by clear and convincing evidence that Mekler's unprofessional conduct violated the rule.

## IV. THE BOARD DID NOT ERR IN FINDING THAT MEKLER'S CONDUCT IN BOARD CASES NOS. 61 & 55, 1993, VIOLATED SEVERAL DLRPC

 The Board found that Mekler was not diligent in his handling of his cases, did not expedite litigation and engaged in conduct that disrupted the tribunal. These findings stemmed from Mekler's conduct with regard to his appearance before Judge Toliver in Superior Court and his subsequent appearances before Judges Ableman, Crompton and Wakefield in Family Court. Mekler disputes the Board's findings on the ground that his request for a delay in the Superior Court proceedings was not the sole cause of his scheduling problems. Rather, he claims it was merely a contributing factor and that he should not have been found to have violated DLRPC 1.3, 3.2 or 3.5(c).

While it is true that Mekler's request was not the sole cause of his subsequent scheduling problems, his lack of complete candor to Judges Toliver, Ableman, Crompton and Wakefield certainly was a contributing factor. Although Mekler did not lie to any of the judges, he was not candid in that he selectively edited the content of what he did tell them. He told Judge Toliver that he had one case in Family Court on the Monday morning following his Superior Court case. He did not tell Judge Toliver that he had a packed schedule that week,[6] with four cases before the Family Court on Monday, Tuesday and Wednesday. Nor did he inform the other judges of the reason why he was requesting continuances.

Further, in Board Case No. 55, 1993, he failed to notice that a case pending before Judge Wakefield was removed from his schedule due to his client's desire not to pursue it. As a result, he did not move to withdraw the action and thus wasted the court's time and resources. There is substantial evidence to support the Board's findings that Mekler violated these Rules of the DLRPC.[7]

## V. THE SANCTION RECOMMENDED BY THE BOARD

The Board suggested that this Court impose a sanction requiring:

(i) Public reprimand and two-year probation;

(ii) Participation with ODC as a presenter/speaker/panelist in at least one Continuing Legal Education presentation in ethics/law office management each year of his initial two years of probation;

(iii) Submission, within three months after the completion of the first three months of probation, of a report to the ODC detailing remedial measures taken, which will serve as the basis for a joint article by Mekler and the ODC for pub-

---

6. Judge Toliver testified that, while he did not think that Mekler lied to him or tried to mislead the court, he would not have granted Mekler's motion for a continuance if he had known of the extent of Mekler's Family Court schedule or of opposing counsel's vacation plans.

7. The ODC also contends that the Board erred when it found that Mekler had not violated other DLRPC. We find the ODC's argument to be without merit.

lication in *In Re, Delaware Lawyer* and *The Delaware Business Review;*

(iv) Letters of apology to all parties including the judges;

(v) Consultation with the Lawyers' Assistance Committee and/or the Solo and Small Firm Practice Committee so as to receive suggestions concerning changes in his procedures and practices;

(vi) An additional six hours of Continuing Legal Education in law office management;

(vii) Payment of ODC costs; and

(viii) Nonpublic understandings including:

(a) psychological treatment;

(b) communication with the ODC every three months; and

(c) harsher punishment if Mekler violates any other DLRPC during probation.

This sanction is similar to the one that the parties originally entered into as part of Mekler's conditional admission. That sanction eventually was disapproved by this Court. *In re Mekler,* Del.Supr., No. 305, 1994, Walsh, J. (Sept. 16, 1994) (ORDER).[8] The ODC contends that, while this sanction is satisfactory if the Court finds that Mekler violated only those DLRPC cited by the Board, it is too lenient if the Court finds violations of all DLRPC that the ODC contends are implicated. In our view, it is too lenient and inappropriate on the basis of the findings of the Board which we have approved.

 "This Court has exclusive authority and wide latitude in determining disciplinary sanctions over lawyers." *In re Figliola,* Del. Supr., 652 A.2d 1071, 1076 (1995) (citing *In re Agostini,* Del.Supr., 632 A.2d 80, 81 (1993)). Therefore, while the Board's recommendations regarding sanctions are often helpful, the Court is not bound by these recommendations and can impose sanctions which it deems appropriate.

8. *For* example, it is plainly ironic and inappropriate to require one whose conduct is as unprofessional as Mekler's has been found to be to give

## VI. CONCLUSION

 When deciding upon the appropriate sanction the Court must consider that "[t]he primary purpose of disciplinary proceedings is 'to protect the public; to foster public confidence in the Bar; to preserve the integrity of the profession; and to deter other lawyers from similar misconduct.'" *Id.* (quoting *Agostini,* 632 A.2d at 81). The lawyer discipline system was not designed to be either punitive or penal in nature. *In re Rich,* Del.Supr., 559 A.2d 1251, 1257 (1989).

 The Court appraises four factors when considering an appropriate sanction: (i) the nature of the duty violated; (ii) the lawyer's mental state; (iii) the actual/potential injury caused by the misconduct; and (iv) the existence of aggravating and mitigating circumstances. *Figliola,* 652 A.2d at 1076.

We have weighed all the foregoing and we find that the duties violated went beyond sloppiness and unprofessional practices. We further find that Mekler's conduct constituted gross negligence and exhibited an attitude of indifference toward his professional obligations. The injuries to clients were extraordinary inconvenience and discourtesy, but did not clearly result in irreparable or severe damage. Mekler's extremely busy practice is not a mitigating factor. The practice of law is not to be conducted in the nature of a street fair or bazaar. It is incumbent upon this Court, the Board and the ODC to be certain that each lawyer's practice is conducted in conformity with the DLRPC.

Most of Mekler's problems stem from a poorly organized office as well as personal disorganization. The record before the Board shows that on several occasions during his twenty-three years of practice, Mekler has been disciplined (including public and private sanctions) for organizational problems.

It is now appropriate to turn to Mekler's prior record and to consider all aggravating and mitigating circumstances. Mekler and the ODC entered into a Stipulation before the Board regarding the aggravating and

educational seminars and write articles about ethical practices.

mitigating circumstances. That Stipulation, which we accept for purposes of this Opinion, is, in pertinent part, as follows:

## I. *Aggravating Factors.*

1. *Prior discipline (ABA Standard 9.22(a)).* Disciplinary sanctions have been imposed upon the Respondent in the following previous cases:

(a) Censor Committee [9] Case No. 382 (12/8/75)—private censure;

(b) Censor Committee Case No. 481 (1/22/77)—private censure;

(c) Censor Committee Case No. 613 (12/29/78)—private censure imposed by Censor Committee became public censure along with $1,000.00 fine imposed by Delaware Supreme Court on appeal in *In re Mekler,* Del.Supr., 406 A.2d 20 (1979) (violations of DR 7–102(a)(7), DR 7–105);

(d) Censor Committee Case No. 746 (11/12/80)—private censure;

(e) Censor Committee Case No. 834 (11/9/83)—private censure;

(f) Board Case No. 1031 [Supreme Court No. 155, 1989] (6/7/89)—public reprimand (violations of DLRPC 1.1, 1.3, 1.4(a), 1.16(d));

(g) Board Case No. 6, 1988 [Supreme Court No. 155, 1989] (6/7/89)—public reprimand (violations of DLRPC 1.3, 1.4(a), 3.2); and

(h) Board Case No. 46, 1991 [Supreme Court No. 571, 1992] (2/9/93)—public reprimand (violations of DLRPC 3.4(c), 8.4(d)).

2. *Pattern of misconduct (ABA Standard 9.22(c)).* The disciplinary violations found in the present case, as well as Respondent's prior similar violations as listed above, show the presence of a "pattern of misconduct" as an aggravating factor.

3. *Multiple offenses (ABA Standard 9.22(d)).* Since the Board's Final Report in this case contains a finding that Respondent violated several of the disciplinary rules, this demonstrates the presence of "multiple offenses" as an aggravating factor.

4. *Substantial experience in the practice of law (ABA Standard 9.22(i)).* By the Respondent's admissions in the pleadings, he has been a member of the Delaware Bar since 1972, demonstrating the presence of "substantial legal practice experience" as an aggravating factor.

## II. *Mitigating Factors.*

1. There was no finding of knowing or intentional conduct in the instant cases. Further, there was no finding of any dishonest or selfish motives. Nor did any of the complaining clients suffer any legal injury.

2. Respondent has cooperated fully with Disciplinary Counsel.

3. Substantial medical and psychiatric problems . . . [and] severe financial [and family problems of Respondent].

4. In order to correct the overload of cases for which he has been responsible (600–700 per year) and which have been the underlying root cause of difficulties, including scheduling conflicts with the Family Court, he has encountered over recent years, and especially to avoid the problems caused by conducting major practices in both the Superior Court and the Family Court, as he has done throughout the majority of his practice, he has associated himself with another attorney, Thomas A. Ellis, Esquire, a former Deputy Attorney General, who is primarily responsible for the bulk of the criminal cases that come into the office.

5. Respondent has completely computerized his office, including providing cross-checks between client files, calendar files and tickler files to show all court schedules, so as to avoid the potential for scheduling conflicts.

6. Respondent has dedicated himself to providing a broad range of legal services at a reasonable cost to a segment of the population who might otherwise not be able to provide for its own representation. He has performed a substantial number of legal services voluntarily without compensation.

7. Respondent's concern over the risk of potential harm to clients resulting from scheduling difficulties inherent in a Family

---

**9.** The Censor Committee was the precursor to the Board.

Court practice, and his remorse over the problems perceived by his clients and judges in the present matters, has led Respondent to taking the steps described above, even before the complaints in the present action were filed, to insure better service to his clients and the courts and to avoid future disruptions to the judicial process.

8. Respondent has a long history of service to the Bar, including serving on the Special Committee on Revision of Delaware Criminal Law, the Supreme Court Study Committee on Uniform Rules of Evidence, the Special Committee on Revision of Supreme Court Rules, the Committee on Continuing Legal Education, the Third Circuit Judicial Selection Commission, the Third Circuit Judicial Conference, Governor Terry's Committee on Modernization of the Delaware State Constitution, and served as a State Commissioner from Delaware on the National Conference on Uniform State Laws. He also participated in defining the statutory guidelines for the Delaware Justice of the Peace Court.

In addition, Respondent established and conducted for almost 20 years the first bar review course for Delaware and conducted training courses in Criminal Law and Procedure for Justices of the Peace and Magistrates. He has also lectured on criminal law and procedure, evidence and constitutional law at the Delaware Law School and the University of Delaware.

9. Respondent also has a long history of service to the community. He organized and chaired the Annual Conference on National Governmental Affairs in Washington, D.C. and the Annual Conference on State Governmental Affairs in Dover, Delaware. He was the co-chairman of the White House Conference on Civil Rights held in Wilmington, State Chairman of the Delaware Junior Chamber of Commerce Governmental Affairs Committee, President and Founder of Governor Bacon Mental Health Auxiliary, President and Founder of Delaware Citizens for Fair Housing (a prime force behind the drafting

and enactment of the Delaware Fair Housing Act of 1966), and a member of the Board of Directors of the American Civil Liberties Union. He originated, co-produced and served as permanent moderator for almost three years of a weekly public affairs program on Channel 12 in Delaware devoted to discussion of governmental, judicial and social issues.

■ After considering the nature of the violations before us and the aggravating and mitigating factors, we have concluded that the aggravating factors outweigh the mitigating factors in view of Mekler's disciplinary history and his failure to make appropriate and timely responses to multiple private and public sanctions over the course of his career. Accordingly, the sanction of a one-year suspension is appropriate. *See In re Tos,* Del. Supr., 576 A.2d 607 (1990) (one-year suspension for various violations involving lack of diligence and promptness in handling client matters).[10]

The conditions for reinstatement should include specific remedial measures relating directly to Mekler's lack of organizational skills and insensitivity to professional obligations. This is necessary in view of the need to assure that Mekler will take further and effective measures, beyond those noted in the list of mitigating factors, to organize and supervise his office. Mekler will be eligible to apply for reinstatement after completion of the one-year suspension and after "produc[tion] [of] clear and convincing evidence of professional rehabilitation, fitness to practice, and competence," *In re Reed,* Del. Supr., 584 A.2d 1207, 1209 (1990) (interpreting Rule 23 of Rules of Board on Professional Responsibility) (emphasis omitted), as well as a showing "that the resumption of the practice of law within Delaware will not be detrimental to the administration of justice," Bd. Prof.Resp.R. 23(f).

The conduct of the members of the Bar must meet reasonable professional standards so that the public is appropriately served by and protected from any member of the Bar

---

**10.** *Cf. In re Kennedy,* Del.Supr., 503 A.2d 1198 (1985) (history of repeated violations); *In re Ryan,* Del.Supr., 498 A.2d 515 (1985) (altering letter to state securities agency); *In re Frabizzio,* Del.Supr., 498 A.2d 1076 (1985) (false settlement sheets).

of this Court who (like Mekler in this case) operates his or her practice in a sloppy, grossly negligent and disrespectful manner in disregard of minimal professional expectations. It is the exclusive responsibility of this Court to preserve the integrity of the Bar. Accordingly, **THE JUDGMENT OF THIS COURT IS AS FOLLOWS:**

(1) Respondent shall be prohibited and suspended from engaging in the practice of law for a period of not less than one year, beginning not later than January 1, 1996 and ending upon his reinstatement, for which application may be made after December 31, 1996.

(2) During the suspension, Respondent shall conduct no act directly or indirectly constituting the practice of law (including the sharing or receipt of any legal fees).

(3) Respondent shall comply with the provisions of Rule 24 of the Rules of the Board on Professional Responsibility.

(4) Respondent shall arrange with another member or members of the Delaware Bar to protect the interests of any of his clients during the period of suspension, and shall submit to this Court on or before March 1, 1996, a certificate of compliance with this paragraph, co-signed by the attorney or attorneys who have undertaken such assignment.

(5) As a condition of reinstatement, Respondent must comply with the following:

(a) He shall send letters of apology to the complainants and any other injured parties, including the judges involved,[11] in each of the matters referred to herein, with copies to the Office of Disciplinary Counsel.

(b) He shall consult with the Professional Guidance Committee of the Delaware State Bar Association and a representative of the Trustees of the Lawyers' Fund for Client Protection regarding his law office practices, and shall agree to implement whatever reasonable changes in proce-

dures or practices are suggested by either of those entities.

(c) He shall complete an additional six (6) hours of continuing legal education in ethics and professionalism, over and above his presently mandated hours, prior to applying for reinstatement, and shall report his completion of such work to the Office of Disciplinary Counsel.

(d) He shall complete an additional six (6) hours of continuing legal education in law office management.

(e) He shall pay the costs of the Office of Disciplinary Counsel for this disciplinary proceeding, as well as any other costs incurred in seeking reinstatement.

(6) This Opinion shall be disseminated by Disciplinary Counsel in accordance with Rule 3 and Rule 14 of the Rules of the Board on Professional Responsibility.

---

11. It is to be noted, with the utmost regret, that the Honorable Jean Ashe Crompton is deceased. Also, Judge Robert W. Wakefield has retired. This condition, as it applies to Judge Crompton and Judge Wakefield, may be fulfilled by a letter of apology to the Family Court through its Chief Judge, The Honorable Vincent J. Poppiti.