**In the Matter of a Member of the Bar of the Supreme Court of the State of Delaware Francine R. SOLOMON.**

**No. 284, 1999.**

Supreme Court of Delaware.

Submitted: Nov. 18, 1999.

Decided: Dec. 21, 1999.

Jeffrey M. Weiner, Wilmington, Delaware, for Respondent.

Andrea L. Rocanelli (argued), Mary M. Johnston and Michael McGinniss, Office of Disciplinary Counsel, Wilmington, Delaware.

Before HOLLAND, HARTNETT and BERGER, JJ.

PER CURIAM.

The matter before this Court is a Disciplinary Proceeding. The Board of Professional Responsibility ("Board") has filed a Final Report ("Report") with regard to charges of professional misconduct. The Respondent is Francine R. Solomon ("Solomon"). Neither the Office of Disciplinary Counsel nor Solomon has filed any objections to the Board's Report.

This Court has heard oral argument and received supplemental submissions on the issue of sanctions. The sanctions imposed by this Court are: permanent conditions and limitations on Solomon's practice of law in the future; the award of restitution to certain persons; and the imposition of a public reprimand with a public four-year probation, also subject to certain terms, conditions, and limitations.

## PREHEARING STIPULATION AGREED FACTS AND AD-MITTED VIOLATIONS

The Office of Disciplinary Counsel ("ODC") and Solomon submitted stipulated

findings of fact and admitted violations of the Delaware Lawyers' Rules of Professional Conduct (the "Rules") with regard to the allegations in the Consolidated Petition for Discipline to the Board. The relevant portions of the prehearing stipulation are set forth, as follows: [1]

### Board Case No. 57, 1998

### Agreed Facts

1. After conducting an audit of the Respondent's law office books and records on June 24, 1998, Martin Zukoff, C.P.A. ("Zukoff"), Auditor for the Lawyers' Fund for Client Protection ("LFCP"), reported to the ODC on June 30, 1998 ("First Report") that the Respondent, on her 1998 Certificate of Compliance submitted to the Delaware Supreme Court, had improperly certified that she was in compliance with items 3, 4, 5, 6(a), 6(b), and 6(d). Specifically, in the First Report, Zukoff found that:

(a) On the Respondent's manual cash receipts and cash disbursement system, monthly columns were not totaled or balanced, even though checks and deposits were recorded;

(b) The Respondent was not performing a procedure required for attorneys using a manual (i.e., non-computerized) system, wherein in the absence of a general ledger, a reconciled monthly cash balance for each bank account is obtained by agreeing totals from the cash receipts and disbursement journals to the ending check register balance;

(c) Reconciliations of check register balances for all bank accounts were not reconciled monthly to bank statement balances;

(d) Although a monthly summary of client transactions was prepared, the client balances were not reliable and had to be verified (per the Respondent);

(e) A monthly listing of client balances was prepared, but the individual client balances and the total of all client balances

were not accurate and could not be relied upon (per the Respondent);

(f) Since there were no reconciled cash balances and no accurate totals of client balances, no reconciliations of the end-of-month cash balance and the total of the client balance listing were performed; therefore, it was not possible for Zukoff to determine whether client balances were adequately funded in the escrow bank account; and

(g) A number of records, including 1998 bank statements for the Respondent's account and the escrow account, the 1997 and 1998 payroll tax returns, and the 1997 and 1998 gross receipts tax returns, were not available in the Respondent's office because they were still in her accountant's office, despite prior instructions to the Respondent to make this information available for the audit.

2. By letter from the ODC dated July 16, 1998, the Respondent was notified of these findings and given an opportunity to correct her bookkeeping procedures.

3. On November 12, 1998, Zukoff performed a follow-up compliance audit of the Respondent's accounting records and, on November 20, 1998, Zukoff issued an interim report ("Second Report"). In the Second Report, Zukoff found that:

(a) The Respondent had engaged a CPA firm to bring her books up-to-date. Although not identified by name in Zukoff's Second Report, the accounting firm that was engaged by the Respondent was Papaleo, Rosen, Chelf & Pinder, P.A., 1309 Philadelphia Pike, Wilmington, DE 19810 (the "Papaleo Firm");

(b) Starting with December 31, 1993, the last time when the Respondent had a client balance listing total that agreed with the check register balance, the accountants at the Papaleo Firm entered all escrow account transactions from January 1, 1994 through September 1, 1998. The main problem encountered in this process was

---

1. The names of Solomon's clients are pseudo-nyms selected by this Court.

that when the Respondent withdrew her earned fees from the escrow account, she typically withdrew one check for a round amount with no detail of which client accounts were affected;

(c) To determine what individual client balances should have been at the end of each year, the accountants at the Papaleo Firm used trust balances on client bills and an uncontrolled list that the attorney maintained. They also reviewed documentation in client files to verify these balances. The total of these client balances was then compared to the reconciled cash balance to determine whether there was sufficient cash in the bank to cover monies being held for clients;

(d) It was determined that there were significant shortage variances (cash in the bank less than the total of client balances) every year. As of August 31, 1998, the latest date completed at the audit date, there was a shortage of $83,799.71. Except for deposits totaling $27,558.17, which never reached the bank, there was no explanation as to why these shortages occurred;

(e) To reduce this shortage, the Respondent did not withdraw any earned fees starting in September 1998 through November 20, 1998; in addition, on November 17, 1998, the Respondent deposited $57,885.00 and, on November 19, 1998, she deposited $2,582.05 into the escrow account. According to the Papaleo Firm, these deposits would bring the bank account into agreement with the total of client funds;

(f) The Respondent did not file or pay Delaware Gross Receipts taxes for at least the last several years. The accountants at the Papaleo Firm informed Zukoff that returns were being filed and taxes paid for 1996 and 1997. The tax liabilities were $920.42 for 1996 and $698.68 for 1997. At the time of the Second Report, the taxes due for the first three quarters of 1998 were being calculated.

4. In the Second Report, Zukoff stated that this Report should be considered as preliminary. After the Papaleo Firm completed the October 1998 reconciliation, Zukoff planned to return to the Respondent's office to verify the information he obtained from the CPA firm and the activity for the months of September and October. At that time, Zukoff would also attempt to determine why there were such significant shortages.

5. On January 9, 1999, following another visit to the Respondent's office, Zukoff issued a report of his findings (the "Third Report"). In the Third Report, Zukoff found, among other things, that:

(a) As in the Second Report, he noted a shortage (reconciled cash balance less than the total of all client balances) in the escrow account of $83,799.71 as of August 31, 1998,[2] and that as of November 3, 1998, the date of the latest reconciliation, the shortage was $60,467.05;

(b) On November 17, 1998, the Respondent deposited $60,467.05 of her own funds in the escrow account, and the shortage was also reduced by the attorney not withdrawing earned fees in the months of September and October;

(c) After the deposit, the reconciled cash balance agreed with the total of all client balances, which were all current;

(d) In the period 1993 through August 1998, there was a significant lack of control over the escrow account; although the Respondent did produce a monthly list of client balances which she used to make withdrawals of earned fees, these balances were not correct; refunds of unused retainers and payments of court fees and other expenses were frequently not posted to the client ledger, resulting in excess withdrawals since the client balances were overstated; in the period of almost six years, the shortage gradually accumulated

---

2. Although the text of Zukoff's Third Report sets forth a figure of $83,779.71 for the shortage, this was apparently a typographical error in the preparation of the Report.

to the amounts noted in paragraph (a) above;

(e) In the period 1993 through August 1998, despite the significant shortages, there were no overdraft balances in the escrow bank account; at any given time, the Respondent was holding, on the average, three months of retainers; for example, at November 3, 1998, the total of current client funds she was holding was $98,300, approximately 25 percent of her annual fee income; the cash flow of new unused retainers offset the shortages in the account and enabled her to maintain positive bank balances;

(f) The bank reconciliation as of November 30, 1998 was not completed because the First Union bank statement was not received until late December; at the time of the Third Report, the Papaleo Firm was working on it;

(g) The remaining Delaware Gross Receipts tax returns were filed; the liability for the first three quarters of 1998 was $597.24;

(h) As of the date of the Third Report, the Respondent was in compliance.

### Board Case No. 57, 1998

### Admitted Violations

1. The Respondent admits **Count 1** of the Petition, which alleges that the Respondent violated Rule 1.15(a). Rule 1.15(a) requires that a lawyer holding the property of clients or third persons shall identify and appropriately safeguard such property, and shall maintain complete records of such property for a period of five years after the completion of the events that they record. The Respondent admits that she violated Rule 1.15(a) by failing to properly identify and safeguard the property of clients and third persons, including by failing to maintain sufficient funds in her client escrow account to cover the total of client balances, as outlined in the Second and Third Reports prepared by Zukoff.

2. The Respondent admits **Count 2** of the Petition, which alleges that the Respondent violated Rule 1.15(d) and Interpretive Guideline No. 2. At the time when the conduct alleged in the Petition occurred, Rule 1.15(d) required that "a lawyer shall adhere to the provisions of Interpretive Guideline No. 2," which set forth detailed and specific requirements for the maintenance of attorneys' books and records. The Respondent admits that she violated Rule 1.15(d) and Interpretive Guideline No. 2 by failing to maintain her books and records in the manner required by Rule 1.15(d), and as outlined in the First, Second, and Third Reports prepared by Zukoff. . . .

### Board Case No. 26, 1998

### Agreed Facts

1. Jane Jones retained the Respondent to represent Jones in divorce and ancillary proceedings in Family Court. As of August 1997, all of the ancillary matters had been resolved with the exception of the equitable division of property and alimony. Jones sought alimony from her former husband.

2. At an August 14, 1997 teleconference involving the Respondent and . . . ., the attorney for Jones' former husband, . . ., the [Family Court] directed counsel to file either a stipulation on the remaining ancillary matters or a status letter with the Family Court within two weeks. This direction was confirmed in a letter from [the Family Court] to counsel on August 15, 1997.

3. On October 9, 1997, as a result of the failure of counsel to submit a status letter or stipulation, [the Family Court] dismissed the pending ancillary matters and ordered the case closed ("October 9 Order"). One result of the October 9 Order was that Jones would not receive alimony or child support.

4. On November 4, 1997, the Respondent filed a Motion to Reopen the ancillary matters. In that motion, the Respondent

stated, among other things, that the reason for her failure to file a paper as directed by the [Family] Court was that ... Jones' [former attorney] had not withdrawn her appearance, and that the new counsel for Jones..., had not entered her appearance.

5. On November 7, 1997, following a hearing on a pending Rule to Show Cause petition, the [Family Court] entered an order resolving the Rule to Show Cause and also addressed the pending Motion to Reopen ("November 7 Order"). In the November 7 Order, [the Family Court] indicated that despite the dismissal in the October 9 Order, the current interim alimony and child support order would remain in effect until the Court ruled on the Motion to Reopen. The November 7 Order also granted the Respondent the opportunity to reply to the new opposing counsel's Answer to the Motion to Reopen, which Answer was to be filed on November 9, 1997. [The Family Court] indicated that the reply should advise the Court of what ancillary matters still needed to be resolved, and should include a statement of the Respondent's position as to why the status report was not filed.

6. On November 9, 1997, [new] counsel for Jones filed the Answer to the Motion to Reopen (the "Answer"). The Answer stated, among other things, that:

(a) The appearance of [Jones' former attorney] was still of record as of the time when the status letter was due to be filed with the Family Court, and the Respondent "should have proceeded to avail herself of corresponding or communicating with [the former attorney] rather than refusing to file the necessary status letter";

(b) The [new attorney] did not begin to talk with Jones until after September 16, 1997, long after the status letter was due;

(c) [The former attorney for Jones] called the Respondent at least twice with regard to the status letter, and the Respondent indicated to [that former attorney] that "she would take the necessary steps to follow through with the status report but did not do so";

(d) [The former attorney] made it clear to the Respondent that the status report was the Respondent's obligation, since it was the Respondent's client, Jones, "who had moved for the property division in the first place as well as the alimony claim";

(e) Although the dismissal occurred on October 9, 1997, "there was no call to either [the former attorney or the new attorney] from the time the status letter was due until the present."

7. Despite the request by the [Family] Court in its November 7, 1997 order for the Respondent to submit a reply in support of the Motion to Reopen, the Respondent never filed such a reply.

8. On December 3, 1997, [the Family Court] entered an order denying the Motion to Reopen ("December 3 Order").

9. On December 15, 1997, the Respondent filed a Motion for Reargument with respect to the Court's December 3 Order, and contended, among other things, that "[t]he only event underlying the Court's dismissal of ancillary matters was counsel's inadvertent failure to submit a status report in a timely manner." In an Answer to the Motion for Reargument, [ Jones' new attorney] reiterated that the Respondent "had been forewarned by [the former attorney] that it was up to her to file the necessary letter with the Court but after the Court gave her additional opportunity to respond further she neglected to do this." The Motion for Reargument was denied by [the Family Court] by an order dated December 30, 1997 ("December 30 Order").

10. On January 23, 1998, Jones' new counsel, ... filed on Jones' behalf an Affidavit for Emergency Hearing and an Emergency Motion for Relief from Judgment Pursuant to Rule 60(b) ....

15. As a result of the Respondent's failure to file the status report as required by the Family Court and the consequent dismissal of the ancillary matters in Jones case, Jones has incurred substantial attorneys' fees and costs.

### Board Case No. 26, 1998

#### Admitted Violations

1. The Respondent admits **Count 4** of the Petition, which alleges that the Respondent violated Rule 3.4(c). Rule 3.4(c) provides that a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." The Respondent admits that she violated Rule 3.4(c) by failing to obey an obligation to the Family Court, insofar as she did not file the status letter as directed by [the Family Court] in its letter dated August 15, 1997.

2. The Respondent admits **Count 7** of the Petition, which alleges that the Respondent violated Rule 1.3. Rule 1.3 requires that a "lawyer shall act with reasonable diligence and promptness in representing a client." The Respondent admits that she violated Rule 1.3 by failing to act with reasonable diligence and promptness in representing Jones, including by failing to file in a timely manner the status report required by [the Family Court's] letter dated August 15, 1997, and by failing to reply to the Answer to the Motion to Reopen despite being granted an opportunity to do so by the Court in its November 7 Order.

3. The Respondent admits **Count 8** of the Petition, which alleges that the Respondent violated Rule 1.4(b). Rule 1.4(b) requires a lawyer to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." The Respondent admits that she violated Rule 1.4(b) by failing to explain matters to the extent reasonably necessary to permit Jones to make informed decisions regarding the representation, including by failing to explain to Jones the legal implications of the August 15, 1997 letter from [the Family Court]; the October 9 Order dismissing the pending ancillary matters; the November 4, 1997 Motion to Reopen; the November 7 Order granting the Respondent the opportunity to reply to opposing counsel's response to the Motion to Reopen; the December 15, 1997 Motion for Reargument; the December 23, 1997 Answer from opposing counsel to the Motion for Reargument; or the Court's rulings on the Motions to Reopen and for Reargument.

### Board Case No. 74, 1998

#### Admitted Facts

1. Susan Smith retained the Respondent in January 1997, as a replacement for her previous attorney in a Family Court divorce proceeding.

2. Prior to retaining the Respondent, Smith had filed a petition for Protection from Abuse ("PFA") against her husband. After retaining the Respondent to represent her, the Respondent, on behalf of Smith, requested that the Court permit her to withdraw the PFA petition without prejudice. Although Smith opposed the withdrawal, the [Family Court] granted the request to withdraw the PFA petition.

3. Subsequent to the withdrawal of the PFA petition, Smith filed a motion for attorneys' fees. The Respondent did not inform Smith of the motion or respond to the motion on Smith's behalf. The Family Court granted the motion as unopposed and entered an order to that effect on July 2, 1997 ("July Order").

4. On August 15, 1997, [Smith's attorney] wrote to the Respondent, reminding her of the July Order and requesting that the Respondent ask Smith to arrange payment of the court-ordered attorneys' fees within fifteen days so that a Petition for a Rule to Show Cause need not be filed.

5. On October 10, 1997, [Smith's attorney] wrote to the Respondent, renewing her request that Smith pay attorneys' fees

as ordered by the Family Court and stating that if payment was not received by October 14, 1997, she intended to file a Rule to Show Cause petition.

6. On October 17, 1997, Smith, through counsel, filed a Rule to Show Cause petition, which was served on Smith on December 16, 1997.

7. Smith did not learn of the July Order until on or about November 7, 1997, when she received from the Respondent's office a copy of the October 10, 1997 letter
. . . .

8. After learning of the July Order, Smith attempted to discuss the matter with the Respondent by telephone, but was unable to reach her and left a message. The Respondent subsequently left a voicemail message for Smith, stating, among other things, that she would be "responsible for any problems" relating to her failure to file an opposition to Smith's motion for attorneys' fees. . . .

14. As a result of the Respondent's failure to file an opposition to the motion for attorneys' fees, and the consequent judgment awarding attorneys' fees to Smith, Smith has incurred substantial attorneys' fees and costs. . . .

### Board Case No. 74, 1998

### Admitted Violations

1. The Respondent admits **Count 10** of the Petition, which alleges that the Respondent violated Rule 1.4(b). Rule 1.4(b) requires a lawyer to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." The Respondent admits that she violated Rule 1.4(b) by failing to explain matters to the extent reasonably necessary to permit Smith to make informed decisions about the representation, including by failing to inform or consult with Smith regarding Smith's motion for attorneys' fees.

---

3. The amount of the admittedly unearned funds held by the Respondent varied from $324.00 to $278.20 from March 31, 1997

2. The Respondent admits **Count 11** of the Petition, which alleges that the Respondent violated Rule 1.3. Rule 1.3 requires that a "lawyer shall act with reasonable diligence and promptness in representing a client." The Respondent admits that she violated Rule 1.3 by failing to act with reasonable diligence and promptness in representing Smith, including by failing to file an opposition to Smith's motion for attorneys' fees.

### Board Case No. 121, 1997

### Agreed Facts

1. Doris Doe paid $400 for initial consultations with the Respondent in December 1996.

2. On January 20, 1997, Doe signed a fee agreement by which she formally retained the Respondent to represent her and provided the Respondent with a retainer of $1,000.00. Under the terms of the agreement, the Respondent was to bill Doe at a rate of $200.00 per hour.

3. On April 1, 1997, Doe informed the Respondent's office that the Respondent was not to take any action on her matters until further notice.

4. By letter dated April 14, 1997, Doe terminated the Respondent's representation and requested that her $1,000 retainer be returned because the Respondent had taken no action on her matters from January 1997 through the end of March.

5. In May 1997, the Respondent sent Doe a billing statement indicating, among other things, that the Respondent held $324.00 in client funds.[3]

6. The Respondent failed to return the admittedly unearned funds of $324.00 to Doe even though the representation had been terminated and the Respondent had no claim to such funds. The Respondent admits that she did not return unearned

---

through June 1, 1997, as the Respondent from time to time posted expense charges to Doe's account.

funds to Doe with the May 1997 billing statement.

. . .

15. On November 24, 1998, Jeffrey M. Weiner, Esquire ("Weiner"), on behalf of the Respondent, forwarded to Doe a check in the amount of $278.20, constituting the undisputed portion of the unearned advanced fee. As of that date, the disputed remaining portion of the advanced fee consisted of $600 in fee charges for three hours of the Respondent's time and $46.80 in total costs, all incurred after January 1, 1997.

### Board Case No. 121, 1997

### Admitted Violation

The Respondent admits **Count 13** of the Petition, which alleges that the Respondent violated Rule 1.16(d). Rule 1.16(d) requires that upon termination of representation, a lawyer shall refund "any advance payment of fee that has not been earned." The Respondent admits that she violated Rule 1.16(d) by failing to return Doe's unearned advanced fee after the termination of the representation.

### Board Case No. 73, 1998

### Agreed Facts

1. Ann Adams retained the Respondent to represent her in a divorce proceeding after a consultation on April 26, 1995. She sent the Respondent a follow-up letter establishing her expectations for the representation and provided a $2,000 retainer. Adams then received and signed a retainer agreement from the Respondent.

2. Between May 1995 and March 1996, Adams had several meetings with the Respondent concerning her case. Two of those meetings included Adams. The purpose of the meetings was to work out the details of a property settlement. The last three-way meeting occurred on March 6, 1996. At that time, the framework for a property settlement was developed between Adams and Adams with the assistance of the Respondent.

3. After the March 6, 1996 meeting, Adams was responsible for providing the Respondent with pay-off information on a joint mortgage between herself and Adams on property located at 1424 Barksdale Cove, Memphis, Tennessee ("Tennessee property"). Upon receipt of the pay-off documents, the Respondent was to advise Adams on an appropriate amount to request as a settlement with Adams, as the Tennessee property was "heir property" that had been bequeathed to Adams prior to her marriage.

4. On March 13, 1996, Adams provided the pay-off information to the Respondent. That same day, the Respondent forwarded to Adams for her review a draft Stipulation and Order as to property division (the "Stipulation and Order").

5. On March 21, 1996, Adams returned to the Respondent by facsimile a marked-up draft of the Stipulation and Order.

6. On June 18, 1996, Adams wrote to the Respondent, requesting an update on the status of the property division matter.

7. On August 14, 1996, the Respondent met with Adams in the Respondent's office. At this meeting, Adams signed a revised Stipulation and Order on the property division settlement, which included the marked-up changes that she had provided to the Respondent on March 21, 1996.

8. On August 16, 1996, the Respondent forwarded to Adams a revised Stipulation and Order, which had been signed by Adams. In the cover letter to Adams, the Respondent indicated that she was "requesting that you review the agreement, and if acceptable to you, please sign and return to me in the self-addressed, pre-stamped envelope."

9. Adams returned a signed Stipulation and Order to the Respondent, but struck the clause that he would "Pay one-half of the payoff value less $3,500" as to the mortgage against the Tennessee property.

10. Notwithstanding this substantial alteration to the Stipulation and Order that had been made by Adams, on August 26, 1996, the Respondent filed the document with the Family Court. Prior to filing the document, the Respondent did not inform Adams of the alteration by Adams, or otherwise obtain any authority from Adams to file the document as altered.

11. After she received a copy of the Stipulation and Order signed by [the Family Court], Adams made numerous unsuccessful attempts to speak with the Respondent about the matter by telephone. Adams then hand-delivered to the Respondent a letter dated October 11, 1996, which complained about, among other things, the fact that the Respondent had filed the Stipulation and Order with the substantial alteration made by Adams.

### Board Case No. 73, 1998
### Admitted Violation

The Respondent admits **Count 17** of the Petition, which alleges that the Respondent violated Rule 1.2(a). Rule 1.2(a) requires that a "lawyer shall abide by a client's decisions concerning the objectives of representation ... and shall consult with the client as to the means by which they are to be pursued." The Respondent admits that she violated Rule 1.2(a) by filing the Stipulation and Order that Adams had signed even though it was subsequently altered in its substance by Adams.

### Board Case No. 16, 1998
### Agreed Facts

1. In July 1994, Wanda Ward retained the Respondent to represent her in property division matters pending in Family Court.

2. On August 19, 1996, the [Family Court] entered a Stipulated Qualified Domestic Relations Order ("QDRO") to create and recognize the interest of Ward in certain benefits otherwise payable to her ex-husband. The Order awarded Ward $59,055.91 plus interest from June 15, 1995 to the date of distribution. The Order directed Ward to provide the necessary information to complete the transfer of her benefit.

3. From July 1996 until March 25, 1997, the Respondent failed to follow up to secure the transfer of benefits to Ward.

4. On March 25, 1997, the Family Court held a hearing on a petition for a Rule to Show Cause filed by Ward. Ward contended that Ward had failed to pay him $2,467.54 to pay off an equity line of credit, as required in a Court order of June 27, 1996. At the hearing, the parties agreed that they would resolve the issue by amending the August 19, 1996 QDRO, as to which the Respondent had not yet taken action. On March 26, 1997, the [Family Court] ordered that *"the parties' attorneys are to cooperate in making the appropriate calculations and in filing an amended QDRO on or before April 11, 1997."* (Emphasis added).

5. The Respondent failed to file the amended QDRO, or to take any action to resolve the outstanding property division matters. The Respondent did not contact the Family Court to arrange for any extension of time to file an amended QDRO.

6. The Respondent failed to file an amended QDRO with the Family Court within the time extension specified by [the Family Court] in its letter dated May 29, 1997, or to take any action to resolve the outstanding property division matters.

7. [The Family Court] sent a letter dated May 29, 1997 to the Respondent and Ward's counsel, ... indicating that the amended QDRO had not been filed "even after calls were made to the attorney's offices," and requesting that the amended QDRO be filed with the Court "within the next seven days."

8. The Respondent failed to take further action on the QDRO, or to take any action to resolve the outstanding property division matters. The Respondent failed

to notify the Court that she was not proceeding with the completion of the amended QDRO as ordered by the Court. The Respondent also did not file a motion to request the Court's permission to withdraw from the representation.

9. On July 17, 1997, [the Family Court] signed a Stipulation and Order amending the QDRO to deduct the $2,467.54 that Wife owed to Husband, plus taxes owed on the $2,467.54. The Stipulation and Order expressly stated that *"Counsel for [Wanda Ward] shall promptly prepare and file with Fidelity an Amended Stipulated Qualified Domestic Relations Order."* (Emphasis added). The Respondent's office forwarded this Stipulation and Order to Ward.

10. By letter to the Respondent dated July 29, 1997, Ward advised the Respondent, "Please proceed with the processing of the QDRO for distribution of the Fidelity Value Fund." Ward also explained in the letter that she was unable to come to the Respondent's office because she was still struggling with clinical depression and anxiety.

11. On August 1, 1997, the Respondent wrote to Ward, asking her to come to the Respondent's office to discuss the QDRO and her outstanding bill, which was then approximately $1,000.00.

12. Ward filed a complaint with the ODC on November 19, 1997. By letter dated November 25, 1997, the ODC requested that the Respondent provide a written response to the complaint by December 15, 1997. The Respondent failed to submit a response or request an extension of time to submit a response. By letter dated December 19, 1997, the ODC notified the Respondent that she had failed to respond in a timely manner and asked her to address her apparent violation of Rule 8.1(b).

13. The Respondent submitted her response to the ODC on January 8, 1998. The Respondent did not address the ODC's inquiry about her apparent violation of Rule 8.1(b) for failure to submit a response in a timely manner. She stated that Ward had an unpaid account balance of $1,000.00 and that "I am willing to prepare the final QDRO ... but I need to be paid by Mrs. Ward."

14. In the course of the investigation of this case pursuant to Board on Professional Responsibility Rule 9(b), the ODC sent a letter dated May 28, 1998 to the Respondent, which contained a list of questions and requested a written response no later than June 11, 1998. The Respondent did not provide a written response until July 7, 1998.

### Board Case No. 16, 1998
#### Agreed Facts

The Respondent admits **Count 23** of the Petition, which alleges that the Respondent violated Rule 1.16(b). Rule 1.16(b) provides that a lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client, or if certain specified conditions are met, including "good cause." The Respondent admits that she violated Rule 1.16(b) by abandoning the representation of Ward, including by failing to comply with the Family Court's outstanding orders requiring the completion of a QDRO, and without resolving outstanding property division matters.

### Board Case No. 59, 1998
#### Agreed Facts

1. Betty Blake contacted the Respondent for assistance in a divorce proceeding, after receiving a letter from her husband's attorney, ..., dated April 21, 1998, which enclosed a copy of the Petition for Divorce that had been filed with the Family Court.

2. Blake had a meeting with the Respondent for an initial consultation on May 15, 1998. Blake paid the Respondent $225.00 for this initial consultation.

3. Shortly after the initial consultation, Blake telephoned the Respondent's office and informed the Respondent's secretary that she had legal issues she wanted to discuss with the Respondent. The secretary informed Blake that the Respondent did not consider Blake to be a client until she paid a retainer fee of $2,500.00.

4. On May 28, 1998, Blake mailed a check in the amount of $2,500.00 to the Respondent as a retainer. In a letter that accompanied the check, Blake provided the Respondent with additional information concerning the marital property, and also requested an estimate of the charges for the representation.

5. The Respondent did not contact Blake to respond to the May 28 inquiry, but the check for $2,500.00 was deposited in the Respondent's escrow account.

6. On or about June 9, 1998, Blake was served with the Petition for Divorce, and she forwarded the document to the Respondent. An answer to the Petition was required within twenty (20) days. However, the Respondent did not contact Blake in order to prepare an answer, nor did she file an answer to the Petition.

7. On June 29, 1998, Blake attempted to contact the Respondent by telephone, and when she was informed that the Respondent was out of the office, she left a message requesting that the Respondent return her call. However, the Respondent did not return this telephone call.

8. On June 30, 1998 and July 1, 1998, Blake again attempted to contact the Respondent by telephone, but was unsuccessful and left messages. The Respondent did not return either of these telephone calls.

9. On July 10, 1998, Blake again attempted to contact the Respondent by telephone, but was once again unsuccessful and left a message. Blake informed the Respondent's staff that Blake wished to terminate the representation and to receive a refund of her retainer fee of $2,500.00. The Respondent did not refund the retainer fee in response to this telephone message.

10. On July 29, 1998, Blake telephoned the ODC to lodge her complaint, and indicated her desire for a refund of the retainer and the initial consultation fee. The ODC contacted the Respondent's office by telephone, and requested either that the Respondent mail the refund of the entire retainer that day or call the ODC to explain why the refund was not being sent. That same day, the ODC sent the Respondent a confirming letter.

11. On July 30, 1998, the Respondent sent the ODC a copy of a letter sent to Blake by which the Respondent had refunded the $2,500.00 retainer fee.

### Board Case No. 59, 1998
### Admitted Violations

1. The Respondent admits **Count 24** of the Petition, which alleges that the Respondent violated Rule 1.3. Rule 1.3 requires that a "lawyer shall act with reasonable diligence and promptness in representing a client." The Respondent admits that she violated Rule 1.3 by failing to act with reasonable diligence and promptness, including by failing to respond to the Petition for Divorce on behalf of Blake after having been specifically retained to do so.

2. The Respondent admits **Count 25** of the Petition, which alleges that the Respondent violated Rule 1.4(a). Rule 1.4(a) requires that a "lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." The Respondent admits that she violated Rule 1.4(a) by failing to communicate with and respond to Blake or to promptly comply with Blake's reasonable requests for information.

### Board Case No. 25, 1998
### Agreed Facts

1. In November 1996, Diane Day retained the Respondent for assistance in

obtaining a divorce from her husband. Day paid the Respondent a $2,500.00 retainer.

2. On September 4, 1997, Day sent the Respondent a letter informing her that she was terminating the representation, and that she had retained [another attorney] to represent her. Day also expressly requested a detailed billing statement and a check for the unearned portion of her advanced fee.

3. On September 5, 1997, [the new attorney] sent a letter to the Respondent, informing her that Day had requested that [the new attorney] assume the representation in Family Court and enclosing a Substitution of Counsel for signature. [The new attorney] also stated that "Day has asked me to tell you that she would like an itemized bill and a refund of the balance you are holding in escrow from her initial retainer."

4. On September 18, 1997, [the new attorney] filed with the Family Court a Substitution of Counsel, signed by the Respondent.

5. On or about October 31, 1997, Day submitted a claim with the Delaware State Bar Association's Fee Dispute Conciliation and Mediation Committee ("Fee Dispute Committee"). The claim asserted, among other things, that the Respondent had failed to refund the unearned portion of the retainer fee.

6. On November 4, 1997, . . ., Chair of the Fee Dispute Committee, sent a letter to the Respondent providing her with a copy of Day's claim and requesting that the Respondent advise him in writing within twenty days as to whether she would agree to submit the matter to the jurisdiction of the Committee voluntarily.

7. On December 3, 1997, the Respondent sent a letter to [the Chair] informing him that she would not agree to submit to the jurisdiction of the Fee Dispute Committee.

8. On December 17, 1997, Day sent a letter to the Respondent, reminding her

that the Respondent's "services as my attorney were terminated September 1997," and that she had "made numerous attempts to obtain the remainder of my retainer from you." Day renewed her request for the unearned portion of her retainer fee.

9. Day then filed a complaint against the Respondent with the ODC, which was received by the ODC on January 12, 1998. On March 24, 1998, in her written response to the complaint, the Respondent acknowledged to the ODC that Day had a balance in her account of $926.10. The Respondent also stated that she was awaiting the ODC's instructions with respect to paying Day the $926.10.

10. On April 1, 1998, the ODC sent a letter to the Respondent, informing her of her obligation under the Rules to promptly return to Day any unearned fees, and directing her to do so immediately.

11. On April 28, 1998, the ODC sent a letter to the Respondent, informing her that Day had not received the unearned retainer fee as directed by the letter dated April 1, 1998. This letter directed the Respondent to inform the ODC in writing by May 8, 1998 of the reasons why she had failed to return such unearned fees.

12. On May 5, 1998, the Respondent sent a one-sentence letter to the ODC as notification that she had returned $926.10 to Day.

### Board Case No. 26, 1998
### Admitted Violation

The Respondent admits **Count 27** of the Petition, which alleges that the Respondent violated Rule 1.16(d). Rule 1.16(d) requires that upon termination of representation, a lawyer shall refund "any advance payment of fee that has not been earned." The Respondent admits that she violated Rule 1.16(d) by failing to return promptly the unearned portion of Day's advanced fee after the termination of the representation.

## BOARD HEARING

The following represents a synopsis of the factual recitations in the Board's Report after the consolidated hearing:

### Case No. 57, 1998

Solomon testified that she admitted she violated Rule 1.15(a) and 1.15(d). The shortages were out of her client escrow account. She also testified that she understood that the recommended sanctions must be, but have not yet been, adopted by the Board and then by the Supreme Court. She agreed to not have any further involvement in maintaining funds and bookkeeping functions within any practice, including, without limitation, check writing capacity. She testified on cross-examination that at least $27,500 of the shortage was due to improper handling of the money by an employee who has since been terminated. The reconciliation that was performed by the [private accounting] firm involved literally going through every check drawn on every account maintained by Solomon, and then going to every deposit and trying to break down every deposit. Solomon expended approximately $15,000 to pay the accountants and bookkeepers to perform the exhaustive reconciliation. The $60,000 deposit that was made to resolve this shortage was drawn from Solomon's operating account and represented earned fees.

### Case No. 26, 1998

Solomon testified that she understood that she was making unconditional admissions and admitted violating Rule 3.4(c), Rule 1.3, and Rule 1.4(b). Contemporaneous with the events underlying these violations, Solomon's husband was suffering from Parkinson's disease. His health was declining tremendously. Solomon and her husband planned a three-week trip to Africa because it may have been the last chance they had to travel together before his health deteriorated even further. At the same time Solomon's mother became ill. Solomon checked on her mother's health prior to leaving for the trip to Africa and was told that there was no reason not to travel. However, within hours of her return home, she was advised that her mother had died. Her father survived, but he was 87 years old and his health was not good. In addition, Solomon was having office problems with personnel, and ultimately had to fire her paralegal and secretary. In addition, during the same time period she was diagnosed with osteoporosis.

Solomon testified that she realized the personal stresses in her life did not justify a violation in the disciplinary rules. Because of this experience she has examined her workload and she has taken steps to lighten it. Moreover, Solomon now utilizes a computerized calendaring system for tracking her schedule. Since the fall of 1998, additional changes have been made. Solomon now double-checks everything that is on her desk in the afternoon to make sure that it is on her calendar.

### Case No. 74, 1998

In connection with this representation, she conceded she should have moved immediately to dismiss but did not. She recognized that her client incurred a fine as a result, and has made restitution for that. She admitted violating Rule 1.4(b) and Rule 1.3.

### Case No. 121, 1997

Solomon admitted sloppy bookkeeping on her part with no attention to detail. She admitted violating Rule 1.16(d) and refunded her client a sum which was a compromise of disputed fees and photocopying expenses. Solomon also testified that at the time of the events underlying this case, Solomon had to take over payment of the family bills because of her husband's illness.

### Case No. 73, 1998

She admitted violation of Rule 1.2(a). Although she believed she was then acting in her client's best interest, Solomon now

recognizes that she should have written a letter explaining to her the status of the matter and allowed the client to make the decision.

### Case No. 16,1998

Solomon admitted that she failed to file the QDRO with the Family Court because of a dispute. She recognized that her conduct was inappropriate and currently adopts a policy of informing the client in writing that she would no longer provide legal services and, in fact, would institute suit if she was owed fees. She admitted that she violated Rule 1.16(b). She also admitted that although she did not consider herself to be attorney of record, she refused to take any steps to advise the Court by telephone or any other method, when it became apparent that the Court considered her to be the attorney of record.

### Case No. 59, 1998

Solomon admitted she did not follow up with the client regarding the attorney-client relationship. She admitted violating Rule 1.3 and 1.4(a). She indicated she has a better appreciation for client perception and takes steps to make sure that she takes affirmative action to make sure that the client comes in and discusses similar matters. In this particular case, the client did not suffer any loss of money as a result of the violations.

### Case No. 25, 1998

Solomon also admitted violating Rule 1.16(d) by failing to return promptly the unearned portion of her client's advance fee after termination of the representation. The client was refunded the balance, although Solomon was not technically responsible for some of those funds.

### Respondent's Remorse

The Board asked Solomon why it should not take the view that her violations were the result of arrogance and why it should conclude that the experiences have changed her and would be unlikely to oc-cur again. The Board concluded that Solomon's response poignantly reflected her self-recognition of what she had done wrong. She testified that the experience had been "devastating, needless to say. I don't think I would want to be here again. If there is anything I can take out of this, I certainly have harmed people and have embarrassed myself and my family." Prior to the Board hearing, Solomon had organized the intake of new clients. She had taken steps to better monitor her calendar and financial affairs.

### Joins New Firm

Louis Ferrara, Esquire ("Ferrara") testified that in connection with Solomon joining his law firm, she would never have responsibility for financial record keeping. The intention was to have her transfer whatever money was in her accounts to his firm's accounts. Her firm employees will become his employees. Solomon will not have check writing privileges. One of Ferrara's trusted employees is responsible for bookkeeping and check writing. Moreover, Ferrara will monitor and oversee Solomon's time and determine whether she is overextending herself. Ferrara will read all of Solomon's mail in order to do this. He will also be monitoring incoming phone calls to determine that she is responding. There will be an attorney in the office to assist Solomon. Calendaring for multiple events and multiple deadlines is something with which he is experienced and will make that available to Solomon. It is Ferrara's understanding that Solomon must be working for him.

### *Practice Monitor Established*

David J. Ferry, Esquire ("Ferry") testified that he has agreed to be a practice monitor for Solomon. He is experienced in family matters. He is willing to report periodically to whatever the extent the ODC believes is necessary to monitor Solomon's practice. He is willing to write reports required by the ODC and the Court. Ferry advised the Board that he is

aware of the problems faced by Solomon and is willing to work with her to avoid them in the future.

### Stipulated Aggravating Factors

The ODC and the Respondent stipulated before the Board that the following aggravating factors existed in the consolidated disciplinary matters.

Solomon has substantial experience in the practice of law. Solomon has engaged in a pattern of misconduct, involving her failures to abide by her obligations to properly maintain her law practice accounts, books and records; to protect the interests of her clients through appropriate consultation, communication, and diligent representation; to comply with her obligations to the Family Court; and to otherwise properly manage her law practice as a solo practitioner. Solomon has committed multiple violations of the Rules; and Solomon initially failed to cooperate with the ODC's investigation in Board Case Nos. 26, 1998; 121, 1997; 16, 1998; and 27, 1998.

### Stipulated Mitigating Factors

The ODC and the Respondent stipulated before the Board that the following mitigating factors existed in the consolidated disciplinary matters. Solomon has no prior disciplinary record; Solomon's misconduct does not reflect any dishonest or selfish motive; Solomon has recently and is presently cooperating with the ODC and is making full and free disclosure to the Board; Solomon has suffered from various physical disabilities and impairments during the time(s) that the misconduct in these disciplinary matters has occurred; Solomon has agreed to make restitution to several of her clients in connection with the consensual resolution of these disciplinary matters.

### Stipulated Sanctions Proposed

The ODC and the Respondent jointly proposed that the Board recommend to this Court certain agreed-upon sanctions: conditions and limitations on the Respondent's future practice; the award of restitution to certain persons; and the imposition of a public reprimand with a public four-year probation, also subject to certain terms, conditions, and limitations. Those proposals are as follows:

### Practice Limitations and Conditions

Solomon will close her solo law practice as of the end of the day on April 14, 1999. As of April 15, 1999, Solomon will join the law practice of Louis B. Ferrara, P.A. as an attorney employee. As of April 15, 1999, Solomon will never again practice as a solo practitioner. As of April 15, 1999 Solomon will never again have responsibility for the financial record-keeping requirements imposed by Rule 1.15, other than her continuing responsibilities in connection with winding down Francine Solomon, P.A.

As of April 15, 1999, all monies and funds relative to Solomon's practice will be processed through Louis B. Ferrara, P.A. Solomon will not have any access to any funds, and will not have check-writing privileges. This condition and limitation on Solomon's practice is permanent. If Solomon ever affiliates herself with a law practice other than Louis B. Ferrara, P.A., Solomon must maintain the same restrictions on her access to funds.

As of April 15, 1999, all of the processing of Solomon's time records will be handled by Louis B. Ferrara, P.A. This condition and limitation on Solomon's practice is permanent. If Solomon ever affiliates herself with a law practice other than Louis B. Ferrara, P.A., Solomon must maintain the same restrictions on the processing of her time records.

All administrative and legal staff servicing Solomon will be the staff of Louis B. Ferrara, P.A. Solomon will not have any duties or responsibilities regarding office management. This condition and limitation on Solomon's practice is permanent. If Solomon ever affiliates herself with a

law practice other than Louis B. Ferrara, P.A., Solomon must maintain the same restrictions on her functions in connection with office management.

As of April 15, 1999, Solomon will permanently maintain adequate staffing for her domestic relations matters, such that the size of Solomon's support staff and the amount of work performed by other attorneys under her supervision is commensurate with the volume of Solomon's case load. At the present time and in the foreseeable future, Solomon will be assisted to some extent by Antonia Bevies, Esquire. In addition, Solomon will continue to have the assistance of Jacalyn Aff, Esquire, on a part-time basis (i.e., 20 hours per week) to assist in the preparation of cases for the foreseeable future. It is understood that Aff will not appear in court or sign pleadings, but will do "behind-the-scenes" work, with the consent of Solomon's clients.

Ferrara will monitor Solomon's calendar and client inquiries. In addition, Solomon will implement a specific system to be utilized for tracking inquiries and messages from Solomon's clients and the steps that will be taken to ensure that Solomon contacts those clients in response to inquiries made, which shall be submitted in writing to and approved by the ODC, as shall any subsequent changes therein. This condition and limitation on Solomon's practice is permanent. If Solomon ever affiliates herself with a law practice other than Louis B. Ferrara, P.A., Solomon must maintain the same or very similar system for ensuring that Solomon is adequately communicating with her clients.

### Probation and Practice Monitor

Solomon will be subject to a public four-year probation, which, upon the entry of an order on sanctions by the Delaware Supreme Court, will be effective retroactively to the date of her affiliation with the law practice of Louis B. Ferrara, P.A. and her practice monitor, David J. Ferry, Jr., Esquire, who is a member of the Delaware Bar. During the probationary period, Solomon will have a practice monitor. The ODC and Solomon understand that Ferry has expressed his willingness to serve as Solomon's practice monitor. Solomon will be required to obtain each of her clients' consent to this consideration. There will be no waiver of the attorney-client privilege as to client matters discussed in consultation with the practice monitor. During the probationary period, Solomon will limit the number of active cases she handles at any given time such that she will not have a full-time practice. The actual appropriate number of cases will be at the discretion of Solomon's practice monitor.

Solomon shall cooperate promptly and fully with the ODC in its efforts to monitor compliance with her probation and promptly respond to the ODC's correspondence by the due date. Solomon shall cooperate with the ODC's investigation of any allegations of unprofessional conduct which may come or already have come to the attention of the ODC. Upon the ODC's request, Solomon shall provide authorization for release of information and documentation to verify compliance with the terms of her probation.

If the ODC concludes, after giving Solomon an opportunity to respond and upon consultation with the practice monitor, that Solomon has violated the terms of her probation, the ODC may file a petition directly with the Delaware Supreme Court requesting that the Court suspend Solomon. Solomon will not oppose said interim suspension. Solomon agrees to the expedited handling of new complaints received by the ODC.

### Restitution

Solomon agrees to pay restitution promptly as follows:

To Jane Jones: $12,737.50, consisting of (a) $10,237.50, which is the amount of attorneys' fees and costs that Solomon agrees Jones incurred due to the dismissal of the ancillary matters; and (b) $2,500.00,

which is the amount of the attorneys' fees assessed against Jones by the Family Court for Jones's defense of the Supreme Court appeal that Jones took in order to have her Family Court case on ancillary matters reopened.

To Susan Smith: $1,487.00, which constitutes the amount of attorneys' fees and costs that Solomon agrees Smith incurred as a result of Solomon's failure to file an opposition to the motion for attorneys' fees, and the consequent judgment awarding attorneys' fees to Smith.

To Doris Doe: $346.80, which constitutes a compromised amount of the attorneys' fees and costs charged by Solomon to Doe for Solomon's representation.

To Diane Day: $445.00, which constitutes a compromised amount of the attorneys' fees charged by Solomon and Rybakoff and paid by Day, for legal services in connection with the Motion for Contempt of PFA filed with the Family Court on March 6, 1997 and the hearing before the Court on April 10, 1997.

### *Public Reprimand*

Solomon will be publicly reprimanded for her violations of the Delaware Lawyers' Rules of Professional Conduct.

### Costs

Pursuant to Board Rule 29, Solomon will pay all of the costs of these disciplinary proceedings. Solomon shall also pay the costs of the investigatory audits performed by the Lawyers' Fund for Client Protection.

### *BOARD RECOMMENDED SANCTIONS*

The Board accepted Solomon's unconditional admission of the facts and violations of the Delaware Lawyers' Rules of Profes-

sional Conduct. Therefore, the Board concluded that Solomon had violated Rules 1.15(a) and 1.15(d) in Board Case No. 57, 1998; Rules 3.4(c), 1.3, and 1.4(b) in Board Case No. 26, 1998; Rules 1.4(b) and 1.3 in Board Case No. 74, 1998; Rule 1.16(d) in Board Case No. 121, 1997; Rule 1.2(a) in Board Case No. 73, 1998; Rule 1.16(b) in Board Case No. 16, 1998; Rules 1.3 and 1.4(a) in Board Case No. 59, 1998; and Rule 1.16(d) in Board Case No. 25, 1998. The Board has recommended that this Court approve: Solomon's consent to the imposition of the terms, conditions, and limitations on her future practice of law as set forth in the parties stipulation; Solomon's agreement to pay the restitution noted in the parties stipulation; and Solomon's consent to the imposition of a public reprimand with a public four-year probation, subject to certain terms, conditions, and limitations as set forth in the parties stipulation.

### *STANDARD OF REVIEW*

 This Court has made a careful and independent review of both the factual findings and the conclusions of law that are set forth in the Board's Report. Our scope of review with regard to the Board's factual findings is to determine whether the record contains substantial evidence to support those findings.[4] We review the Board's conclusions of law de novo.[5] We are satisfied that the record before us supports the findings of fact and the conclusions of law made by the Board in this case.[6]

### APPROPRIATE SANCTIONS REPRIMAND AND RESTITUTION PROBATION WITH CONDITIONS

 This Court is vested with the inherent and exclusive authority for disciplinary members of its Bar.[7] The Court

---

4. *In re Higgins,* Del.Supr., 582 A.2d 929, 932 (1990).

5. *Id.*

6. *Id.*

7. *In re Shearin,* Del.Supr., 721 A.2d 157, 165 (1998).

has wide latitude in determining the form of discipline to be imposed.[8] The Court considers four factors when considering an appropriate sanction: (i) the nature of the duty violated; (ii) the lawyer's mental state; (iii) the actual/potential injury caused by the misconduct; and, (iv) the existence of aggravating and mitigating circumstances.[9]

The Court has carefully considered the breadth and scope of the sanctions recommended by the Board. We have been advised that Solomon made prompt and full restitution to the clients identified in the prehearing stipulation. The Court has also been advised that since the Board hearing, Solomon has complied with all of the conditions and limitations recommended by the Board.

The Court approves the Board's recommendations. In addition, the Court has decided that, during the entire probationary period, Solomon must maintain malpractice insurance at the levels of and commensurate with her current coverage.[10] Solomon must also make the following disclosure to all current and prospective clients.

> I am required to inform you that I am on disciplinary probation for violation of the Delaware Lawyers' Rules of Professional Conduct. However, the Supreme Court has noted that this disclosure to my clients is not intended to have adverse implications with regard to my character or fitness to practice law.

This disclosure must be made in writing and at the same time the disclosure is made about the waiver of attorney-client privilege with regard to the role of the practice monitor. The acknowledgment and agreement by the client must also be in a writing that is witnessed by another member of the Delaware Bar.

The Delaware Lawyer's Rules of Professional Conduct are promulgated by this Court to set forth standards of ethical conduct to which all Delaware lawyers must conform to continue to practice law.[11] The lawyer discipline system was not designed to be either punitive or penal in nature.[12] In deciding upon the appropriate sanction, this Court considers the multi-faceted but congruent purpose of disciplinary proceedings is "to protect the public; to foster public confidence in the Bar; to preserve the integrity of the profession; and to deter other lawyers from similar misconduct." [13]

The Court has concluded that all of the congruent purposes of an attorney disciplinary proceeding are met by: the permanent conditions and limitations on Solomon's future practice of law; the award of restitution to her clients; the imposition of a public reprimand with a four-year probation subject to the terms, conditions, and limitations set forth in this opinion. The Court commends Louis B. Ferrara and David J. Ferry, Jr. Their efforts to preserve Solomon's legal career while protecting Solomon's clients are in accordance with the highest traditions of the Delaware Bar.

This opinion shall be disseminated by Disciplinary Counsel in accordance with Rule 3 and Rule 14 of the Rules of the Board on Professional Responsibility.

**8.** See In re Member of the Bar, Del.Supr., 226 A.2d 705, 707 (1967).

**9.** See In re Mekler, Del.Supr., 669 A.2d 655, 668 (1995).

**10.** A lawyers' professional liability policy issued through CAN Pro, Policy Number LPC # 0184116981 with limits of liability of $100,000/$300,000 and a $1,000 deductible.

**11.** See In re Member of the Bar, Del.Supr., 257 A.2d 382 (1969).

**12.** See In re Rich, Del.Supr., 559 A.2d 1251 (1989).

**13.** In re Figliola, Del.Supr., 652 A.2d 1071, 1076 (1995) (citing In re Agostini, Del.Supr., 632 A.2d 80, 81 (1993)).